[Civ. No. 39662. Second Dist., Div. One. Apr. 14, 1975.]

RICHARD M. STOCKTON, Plaintiff and Appellant, v.
PABLO ORTIZ et al., Defendants and Respondents.

186

**COUNSEL**

Hanson & Milman and Roger S. Hanson for Plaintiff and Appellant.

Edward D. Nino and William G. Filice for Defendants and Respondents.

## Opinion

**HANSON, J.**—Following rendition of opinion by this court, the Supreme Court granted a hearing and thereafter transferred the cause to us for reconsideration in the light of *Hurtado* v. *Superior Court,* 11 Cal.3d 574 [114 Cal.Rptr. 106, 522 P.2d 666]. Our opinion on reconsideration follows:

### Pleadings

Appellant/plaintiff Richard M. Stockton's (hereinafter Stockton) original complaint was filed on March 21, 1966. The fourth amended complaint, upon which the action proceeded to trial, was filed July 11, 1967. It named as individual defendants Pablo Ortiz (hereinafter P. Ortiz), Louis Federico (hereinafter Federico), John Bonfante (hereinafter Bonfante), Joaquin Rodriquez (hereinafter Rodriquez), Don Johnson (hereinafter Johnson) and Juventino Ortiz (hereinafter J. Ortiz). It also named three Mexican corporations: Loma Linda, S. A., Inversiones Mulege, S.A. de C.V. (hereinafter Inversiones, S.A.) and Club Aereo Mulege, S.A. (hereinafter Club Aereo, S.A.). The theories of the nine causes of action contained therein were not set forth in its caption. Respondents/defendants P. Ortiz, J. Ortiz and Bonfante each filed an answer and counterclaim. The other named defendants were not served and did not appear. The plaintiff seeks to recover $390,000 lost in a business venture in the Republic of Mexico and $400,000 exemplary damages.

The trial by court, nonjury, commenced on December 23, 1970. Some of Stockton's causes of action were dismissed early in the proceedings. On December 30, 1970, the trial court denied plaintiff's motion to amend to conform to proof and add a 10th cause of action. On December 31, 1970, at the close of plaintiff's case, defendants moved for a judgment in favor of defendants pursuant to Code of Civil Procedure section 631.8 as to the remaining causes of action. The motion was granted and subsequently judgment entered for defendants.

Appellant appeals from the judgment.

### Contentions

The fifteen contentions, with subsections, listed in appellant's opening brief merge into two basic issues which warrant consideration by this

court; namely, (1) whether or not the trial court erred in denying plaintiff's motion to amend to conform to proof; and (2) whether or not the trial court erred in granting defendants' motion for judgment pursuant to Code of Civil Procedure section 631.8.

## FACTS

In 1959, P. Ortiz, a Mexican national living in the United States, went down to Baja California with his friend, Bonfante, an American citizen, for a vacation. The two men saw a piece of real property that appeared desirable for developing. In May of 1959 they bought the property from one Zuniga Meya for $5,000. The property deed was put in P. Ortiz's name because Bonfante as a non-Mexican national could not be listed as the owner of the land since it was situated on the seashore.[1]

To obtain additional capital to build a seaside motel on the property P. Ortiz acquired additional partners, namely, J. Ortiz, Johnson, Rodriquez and Federico. In 1959, P. Ortiz and the other individual defendants began to form Loma Linda, S.A., a Mexican corporation. The intended function of Loma Linda, S.A. was to operate in Mexico with American investors and to operate the motel in Mulege (an area of Baja California). In January of 1960, they began building a seaside motel. The formation of Loma Linda, S.A. was never completed; stock was never issued; and there were never any board of director meetings.

In January or February of 1961, P. Ortiz first met plaintiff Stockton at the completed motel while Stockton was a guest of the motel. Stockton became interested in the property as a business venture. At this time Loma Linda, S.A. owned the personal property of the motel and operated same, while P. Ortiz had title to the real property. Negotiations commenced between Stockton and the individual defendants regarding the business venture. Stockton and the individual defendants consulted their respective California attorneys. Stockton's California attorney suggested that Stockton hire a Mexican attorney. Jose Schnaider (hereinafter Schnaider), an attorney of the Mexican bar, was retained by Stockton to represent him in Mexico. Stockton testified that Schnaider told him that it was impossible for an American to take any title, either directly or indirectly, in the property. Stockton, under advice by Schnaider, organized two corporations in Mexico, Inversiones, S.A. and

---

[1]Article 27 of the Mexican Political Constitution, part 1, states in part: "In a zone of one hundred kilometers along the frontiers and of fifty of the seashores, under no circumstances can foreigners acquire direct dominion over lands and waters."

Club Aereo, S.A., to take title to the real and personal property. The purchase price of the realty was to be $150,000 with an additional $25,000 for the personal property. Inversiones, S.A. was the Mexican corporation designated by Stockton to take title to the real property, and Club Aereo, S.A. was the Mexican corporation designated by Stockton to take title to the personal property.

Thereafter on September 4, 1961, a 10-page written agreement, of the type to be executed between Mexican corporations, was entered into between the named individual defendants and Loma Linda, S.A., as sellers, with Inversiones, S.A. and Club Aereo, S.A., as buyers. Bonfante testified that at the time of the negotiations Stockton and Stockton's American and Mexican attorneys all knew that incorporation of Loma Linda, S.A. was not completed and that Stockton's attorneys drew up the agreement. Plaintiff's Exhibit 1 shows as signators of the agreement, as sellers, the following: P. Ortiz (stockholder), Federico (stockholder), Bonfante (stockholder), Johnson (stockholder), J. Ortiz (stockholder), and P. Ortiz for Loma Linda, S.A.; Schnaider (Stockton's Mexican attorney) signed the agreement for Inversiones, S.A. and Club Aereo, S.A., as buyers.

The agreement does not mention Stockton's name and was allegedly signed in South Gate, California.

The agreement states that the Mexican corporations are de facto corporations *to be formed* under the laws of Mexico and that the defendant listed individuals are stockholders of Loma Linda, S.A., a Mexican corporation. The agreement also acknowledges that the land is situated within the boundaries of an "Ejido."[2]

The agreement, in brief, involves the following recitations: That P. Ortiz developed the land by erecting a hotel, pool, etc.; that Loma Linda, S.A. owns all the movable property; that Inversiones, S.A. wants to buy the P. Ortiz rights in the real property, and Club Aereo, S.A. wants to buy the movable and personal property; that the parties agree to buy and sell to each other; that Inversiones, S.A. and Club Aereo, S.A. are de facto corporations and when they become final they will execute

---

[2]An "ejido" is a Mexican communal agricultural area which is owned by the Mexican government. The ejidotarians live on the land in a communal existence in relation to producing food. The ejidotarians more or less lease the land from the Mexican government. If the soil in the ejido is nonproductive, then after a period of years the ejidotarians can convey the land to a private *Mexican* citizen. The approval for the transaction must come from the President of Mexico.

the agreement; that Inversiones, S.A. agrees to pay P. Ortiz $150,000 for the real property rights, and Club Aereo, S.A. agrees to pay Loma Linda, S.A. $25,000 for the personal property; that $50,000 is to be put in escrow with the attorneys of both sides to act as trustees, with the money to be in a California bank; that if the funds are not used within 24 months from the signing of the agreement, then Stockton's attorney is to be the sole trustee; that the buyer will pay $2,500 a month toward the remaining $125,000 and if they (Inversiones, S.A. and Club Aereo, S.A.) fail to do so, sellers have the right to retake the property; that upon the execution of the agreement, P. Ortiz is to deliver possession of the land to Inversiones, S.A., and Loma Linda, S.A. its interests to Club Aereo, S.A.; that if buyers need to pay taxes, liens or claims imposed on the properties, sellers will repay buyers; that certain monthly payments will be made until full control is taken by the corporations; that when the sellers perfect title and convey same to buyers, the promissory notes are to become due; that in the interim P. Ortiz and Loma Linda, S.A. will be paid rent until title is perfected; that buyers may take possession and operate and maintain the business and retain profits earned during the title clearing period.

It was further agreed that P. Ortiz would try to get rid of the "ejido" and clear the title; that if buyers were deprived of possession, they would be given back their notes, not have to pay the monthly rent, and would be able to re-obtain their $50,000. There were also provisions that the parties could extend the agreement by mutual consent; that if in one year from the signing of the agreement the property was placed in a condition to be transferred, then sellers would obtain the $50,000 and the promissory notes; that if in one year from the date of the agreement, without fault of buyers, the property could not be placed in a condition to transfer good title, buyers would redeliver the property to sellers, and sellers would release the escrow and notes.

Inversiones, S.A. and Club Aereo, S.A. took possession of the property and paid the rent pursuant to the contractual agreement. For two years thereafter these two corporations operated the business and paid the rent, while Stockton's Mexican lawyer attempted to clear the title to the land. From 1961 to 1963 the rent of $1,500 per month was paid, and in 1963 the buyers, Inversiones, S.A. and Club Aereo, S.A., instructed their American attorney to release the $50,000 in escrow to the defendants. Even though the $50,000 was paid, it appears from the record that clear title had not passed. Apparently, the parties felt that the "ejido" problem would be cleared, that Inversiones, S.A. and Club Aereo, S.A. would

make payments of $2,500 a month for the next 12 months, and that during this period the property would be cleared according to Mexican law. The $2,500 payments were to be applied against the purchase price. All payments were made through the corporations, and although the checks may have had Stockton's name on them, they were made in behalf of Inversiones, S.A. and Club Aereo, S.A.. The last check representing payments was dated in January 1965.

Defendants contend that Inversiones, S.A. and Club Aereo, S.A. defaulted on the contract, and that the business was lost. The record is unclear as to what has now happened to the business, who is running it, or whether the land has been taken over by the Mexican government for delinquent taxes.

## DISCUSSION

### Did the Trial Court Err in Denying Plaintiff's Motion to Amend the Fourth Amended Complaint to Conform to Proof?

*Introduction:*

The plaintiff, during trial, made a motion to amend his fourth amended complaint to conform to proof pursuant to Code of Civil Procedure sections 469 and 470. Plaintiff contends the court's denial of the motion constituted prejudicial error.

There were two aspects of plaintiff's motion. One was to amend to reinstate certain causes of action which were dismissed by the court at the inception of the trial. The court had dismissed certain causes of action on the reasoning that they were shareholder derivative causes of action and the corporations had not been served and were not before the court. The other aspect of the motion was an attempt to introduce a new tenth cause of action based on the theory that plaintiff was a third-party beneficiary.

*In re motion to reinstate causes of action previously dismissed by the court:*

The trial court dismissed five of the nine causes of action (Nos. 2, 5, 6, 7 and 9) holding (1) that they were in the nature of derivative stockholder actions brought by plaintiff on behalf of the corporations; (2)

that the corporations mentioned were indispensable parties; (3) that none of the corporations mentioned were before the court as parties, not having been served; and (4) that, therefore, the court lacked jurisdiction to proceed as to those causes of action.

Plaintiff alleged in his second cause of action, incorporated in the fifth, sixth, seventh and ninth causes of action, that he, Stockton, was a duly registered stockholder of the shares of Stockton in Club Aereo, S.A.; that he demanded that the duly designated manager of Club Aereo, S.A., one Frank Chavez, bring suit in the name of the corporation for breach of the written contract agreement heretofore referred to which he failed to do. The complaint contains the following words: "Plaintiff herewith brings suit in behalf of Club Aereo Mulege, S.A. under Corporations Code section 834 via a derivative stockholder's cause of action. Plaintiff herewith joins Club Aereo Mulege, S.A. as a defendant in this suit, substituting said corporation as Doe XXII," and refers to "plaintiff's corporation, Inversiones Mulege, S.A. de C.V."

Inversiones, S.A. and Club Aereo, S.A. having not been served and not appearing as parties to the action before the trial court and being indispensable parties, the court lacked jurisdiction. Therefore we hold that the trial court properly dismissed these causes of action and properly denied plaintiff's motion to reinstate these causes of action. (See *Beyerbach* v. *Juno Oil Co.,* 42 Cal.2d 11, 27, 28 [265 P.2d 1]; *Melancon* v. *Superior Court,* 42 Cal.2d 698, 708 [268 P.2d 1050]; *Keeler* v. *Schulte,* 47 Cal.2d 801 [306 P.2d 430]; *Southern Cal. Title Clearing Co.* v. *Laws,* 2 Cal.App.3d 586, 589 [83 Cal.Rptr. 8].)

*In re motion to add a new tenth*
*cause of action based on the theory*
*of third-party beneficiary:*

Plaintiff based this aspect of his motion on information obtained from adverse witnesses during the trial. These witnesses allegedly and according to plaintiff's theory established plaintiff as a third-party beneficiary of the original contract, the theory being that plaintiff signed checks and that the defendants were attempting to clear the title on the Mexican real estate for plaintiff's benefit. As previously noted, plaintiff's name did not appear on the original contract, or on any other legal document that would show a transferable interest in the property in Mexico.

The court in denying the motion to bring in a new cause of action stated:

"THE COURT: The Court at this time will make its ruling.

"Previously, the Court had stricken cause of action 2, 5, 6, 7 and 9, which were derivative in nature, which the plaintiff was bringing on behalf of the corporations.

"The corporations, not appearing in this action, the Court held since they were indispensable parties, they could not proceed on those various causes of action.

"Counsel for plaintiff, at least the plaintiff, knew that they would not appear at least on July 11, 1967, if not before that time, at which time they filed their forth [*sic*] amended complaint and they allege on page 8 in the second cause of action that they won't cooperate and indicate they are not going to assist whatsoever and so on and so on.

"So they knew the corporation wasn't agreeing and probably would not be here representing the corporation.

"That's three and a half years ago.

"Knowing that if counsel wanted to have another cause of action, they could have inserted it at that time three and a half years ago, but at this late date during trial, to submit a new cause of action for a third party beneficiary, the Court in exercising its discretion denies the motion to amend the pleadings."

In the leading case of *Trafton* v. *Youngblood,* 69 Cal.2d 17 [69 Cal.Rptr. 568, 442 P.2d 648], the court stated at page 32: ". . . 'It is frequently the case that evidence which is admissible to establish one issue may tend to establish another issue than that for which it is offered, and it is a rule that evidence so introduced is available to establish any of the issues in the case. This rule is, however, limited to the issues which are to be tried. If the other issue that the evidence may tend to establish is not before the court the evidence must be limited to the actual issue. The fact of its introduction cannot be used to establish an issue that the parties have not made in their pleadings. The court would not be authorized to consider it as establishing an issue that was not before it for trial.' "

■ Time and knowledge are important factors to be considered when granting or denying a motion to amend. (*Curtis* v. *20th Century-Fox Film Corp.*, 140 Cal.App.2d 461, 465 [295 P.2d 62].) ■ In the case at bench over four and one-half years transpired between the filing of the first complaint and the commencement of trial. The plaintiff either knew or through discovery procedure could have known, before the trial, of the facts upon which he based his motions to amend the complaint during the trial.

To allow plaintiff to proceed in the manner desired would have put the defendants in a position of defending against a theory and cause of action they were not prepared for in the middle of trial (*Trafton* v. *Youngblood, supra,* 69 Cal.2d at p. 31), or would necessitate interruption or postponement of the trial to allow defendants time to prepare. (*Manha* v. *Union Fertilizer Co.,* 151 Cal. 581, 584 [91 P. 393].)

■ The trial court has wide discretion where the amendment raises new issues after the pleadings have been settled and the trial has begun. (*McAllister* v. *Metzger,* 220 Cal.App.2d 692, 700 [33 Cal.Rptr. 879].)

■ It is also well settled that unless there is a clear abuse of discretion the denial of allowing a party to amend to conform to proof will not be disturbed on appeal. (*Trafton* v. *Youngblood, supra,* at p. 31.)

■ Therefore, we hold that the record shows no good cause for the delay by plaintiff in making his motion to amend and the trial court did not abuse its discretion in denying plaintiff's motion.

■ In some cases, it is important to determine whether the law of the forum or the law of some other jurisdiction is to be applied as controlling. In those cases, California is committed to the "governmental interest" concept of conflict of laws. (*Hurtado* v. *Superior Court,* 11 Cal.3d 574, 579 [114 Cal.Rptr. 106, 522 P.2d 666].) ■ In the instant case, it is not necessary to determine whether the law of Mexico or the law of California controls for, although they are not identical as to basis, under each the ultimate result would be the same under the facts herein.

■ The general rule is that shareholders in a derivative suit are only representatives of the corporation, which must itself have a cause of action. (*McDermott* v. *Bear Film Co.,* 219 Cal.App.2d 607, 611 [33 Cal.Rptr. 486].) Whether California law or Mexican law be controlling, neither supports the existence of any right or cause in the corporations or

plaintiff on behalf of such corporations. Plaintiff's contentions as to causes of action Nos. 2, 5, 6, 7 and 9 are nonmeritorious as not maintainable in either California or Mexico.

Although plaintiff may have deposited and paid out monies for the benefit of Inversiones, S.A. and Club Aereo, S.A., plaintiff is not listed anywhere as *a shareholder,* partner, director, officer or fiduciary having a *legal* fiduciary interest in Inversiones, S.A. or Club Aereo, S.A. ██ Thus, plaintiff is unable to show a *"legal nexus"* between himself and Inversiones, S.A. or Club Aereo, S.A. There is a link missing in the requisite legal chain upon which to base a derivative action under California law.

Inversiones, S.A. and Club Aereo, S.A. do not have enforceable causes of action. Although it is alleged that a contract was entered into in California, the transaction concerned the transfer of real and personal property in Mexico, and the signators of the contract were American citizens and Mexican nationals.

As previously noted, the Mexican land referred to in the case at bench was located on the sea in Baja California and was part of an "ejido," an "ejido" being agricultural land that was nationalized in the early twenties as cooperative land within the domain of the poor rural farmers. The title of the "ejidos" resides with the Mexican government, and the title to these lands cannot be disposed of or transferred without the consent of the government. The attempted acquisition of the land in question was apparently illegal and void under Mexican law[3] and therefore unenforceable in Mexican courts.

---

[3]Article 27 of the Mexican Constitution, as amended in 1948, states in part: "I. Only Mexicans by birth or naturalization and Mexican companies [meaning both corporations and partnerships] have the right to acquire the ownership of lands, waters . . . in the Mexican Republic . . . . Within a zone of one hundred kilometers along the sea coast, no alien shall under any conditions acquire direct ownership of lands and waters."

Article 1 of the Organic Law of section I of article 27 of the Mexican Constitution states that: "No foreigner can acquire the direct ownership of lands or waters within a zone of 100 kilometers along the frontiers or of 50 kilometers along the coasts nor be a member of Mexican companies acquiring such ownership within said zone."

Article 8 states that "Acts done and contracts made in contravention of the prohibitions contained in this law shall be absolutely void."

Article 1 of the Regulations of the Organic Law of section I of article 27 of the General Constitution of the Republic states that: "Notaries, Mexican counsel abroad and all other public officials concerned, shall abstain under penalty of loss of office or of employment from authorizing deeds or other instruments which purport to transmit to alien individuals or companies the direct ownership of lands, waters and their accessories in a zone of 100 kilometers along the frontiers and of 50 along the coasts, or which

Inversiones, S.A. and Club Aereo, S.A. do not have enforceable causes of action either in Mexico or California.

Furthermore, a controlling shareholder in a foreign corporation (which plaintiff contends he is as to Inversiones, S.A. and Club Aereo, S.A.) seeking redress in California courts, cannot circumvent and frustrate the California body of procedural and substantive law pertaining to derivative actions by asserting that a contract which benefits a foreign corporation is one for his benefit and recover under a third-party beneficiary theory, where if he, as an individual, had entered into the contract in the foreign corporate jurisdiction, it would be illegal and void and thus unenforceable.

*Did the Trial Court Err in Granting*
*Defendant's Motion for Judgment Pursuant*
*to Code of Civil Procedure Section 631.8?*

When plaintiff Stockton rested his case in chief, there remained four

---

purport to confer upon or transmit to foreign individuals or companies any interest or participation as members in Mexican companies holding the direct ownership of lands, waters or their accessories within the said zones."

Article 8 says that any such acquisition shall be void. "Art. 8. In accord with Art. 1 of the Organic Law of Fraction I of Art. 27 of the Constitution, Mexican societies formed to exploit . . . may acquire . . . lands within the prohibited zone . . . but always with the previous permit of the Secretariat of Foreign Affairs and it shall be expressly agreed that no foreign person, physical or moral, shall hold any social participation or own shares of the society. If for any reason, any of the persons heretofore mentioned should, in any event, acquire a social participation or become owner of one or more shares, violating the provisions of the preceding paragraph, it is agreed, as of this time, that such acquisition shall be void, that said social participation and certificates shall be canceled and without any value. . . ."

Appellant in his pleadings also included the following Mexican laws (C.T. pp. 110-111):

*"DECREE OF JULY 7, 1944:*

"Art. 1. As long as the suspension of guarantees decreed on June 1, 1942 remains in force, foreigners and Mexican societies which have or may have foreign shareholders shall require a prior permit, grantable by the Secretariat of Foreign Affairs in each case, to do any of the following things:

"a). . . . . . . . . . . . . . . . . . .

"d). To acquire ownership of lands, waters and their accessions referred to in Fraction I. of Art. 27 of the Constitution.

". . . . . . . . . . . . . . . . . . .

"Art. 5. Acts done in contravention of the provisions of this Decree shall not produce effects of any nature in favor of the persons who participate in same and the property which is the subject matter of such acts shall be forfeited to the Nation.

". . . . . . . . . . . . . . . . . . .

"Art. 7. When the infringement of provisions of this Decree are consummated by means of false declarations or by concealment of the fact of alienship or through a dummy, the persons found responsible shall be sentenced to imprisonment for a term of from six months to three years and a fine not exceeding ten thousand pesos."

causes of action (Nos. 1, 3, 4 and 8). Defendants moved for judgment pursuant to Code of Civil Procedure section 631.8.

The reporter's transcript on appeal reflects that the trial court, before granting defendants' motion, reviewed approximately 40 pages of notes and all the exhibits and, in open court, in the presence of counsel, carefully evaluated the evidence bearing on the remaining causes of action.

The trial court, referring to causes of action Nos. 1, 3 and 4 which involved conspiracy based on fraud and deceit—intentional and negligent fraudulent misrepresentation, found: that defendants, relying on what rights they had in the property in question, invested substantial amounts of money for improvement before ever meeting plaintiff Stockton, and that the plaintiff knew there was a title problem with respect to the "ejido" some months prior to signing the agreement. The trial court stated: "So at all times, it seems to the Court, the plaintiff knew what rights, if any, the defendants had, was not misled. . . . So it is pretty hard to say with respect to title that there was any fraud or deceit upon the plaintiffs [sic] in this action. Certainly, there was no reliance."

Also, as to plaintiff Stockton's allegation that he was not advised that Loma Linda, S.A. was not a corporation, the trial court pointed out that there was direct evidence from defendants P. Ortiz and Bonfante to the contrary; that Schnaider, Stockton's Mexican attorney, told Stockton that Loma Linda, S.A. was not a corporation; and that there was circumstantial evidence in the manner the agreement was signed that plaintiff Stockton had knowledge that Loma Linda, S.A. was not a corporation. The court stated: "So considering all the testimony the Court has before it, with respect to Loma Linda, I don't think the plaintiff was misled. Certainly, they [sic] placed no reliance upon it."

As to plaintiff Stockton's allegation that defendants represented that two corporations were needed to be formed to hold the real and personal property respectively, the court in finding no validity to his allegation, held that it was Schnaider, plaintiff's own Mexican attorney, who recommended and suggested the two corporations, Inversiones, S.A. and Club Aereo, S.A. be formed for that purpose.

Further, the court, in finding no validity to plaintiff's allegation that defendants made false statements in respect to the payment of taxes, stated: "As I indicated, there were no false statements made. There was

also no reliance on it because the agreement provided that the buyers could pay those taxes and get reimbursed."

As to the eighth cause of action (disparagement of title), the trial court stated: ". . . the Court's of the opinion and finds that any disparagement of title, if there was any, was the cause of action of the corporation and not anything personal to this plaintiff; and, certainly, none of the defendants who are before the Court had anything to do with such disparagement of title.

"In fact, all the testimony indicated they had nothing to do with the operation of the club after the plaintiff took possession."

The court concluded its findings, stating from the bench: "With respect to title in the complaint, it says that after numerous demands by plaintiff, defendant admitted in the early 1965, that title could not be conveyed because they didn't have good title.

"Well, as the Court has indicated, the plaintiff knew they didn't have title that they could convey, that the plaintiff was spending a good deal of money trying to handle it. He thought at first it would be a simple matter.

"Later on, Mr. Schnaider indicated it could be cleared in a year or so. In fact, insofar as fraud is concerned or the intent to deceive is concerned, the agreement, itself, provided after one year if Mr. Schnaider thought there was no possibility or probability of clearing title, the entire deal was cancelled.

"Then it went on further, that if he wanted to continue the second year, they could continue a second year in an attempt to clear the title.

"And at that time, again, it would be up to Mr. Schnaider to determine whether there was a possibility or probability of clearing title.

"And at that time, they could have gotten out of the deal.

"When the second year expired, instead of getting out of the deal, Mr. Stockton because he invested so much in improvements, decided he would pay over the $50,000 in the purchase price and go ahead with the deal, rather than get out of whatever investment he had down there.

"He did that of his own volition but he could have gotten out of the deal at that particular time.

"So based on the Court's review of the entire matter, the Court finds there is no justification for the charge of fraud, deceit or conspiracy and the misrepresentations and other matters which may be set forth in causes of action 1, 3, 4 and 8.

"The Court feeling that way, I find for the defendants on the remaining causes of action and find for the defense on judgment on 1, 3, 4 and 8."

■ Although Code of Civil Procedure section 631.8,[4] enacted in 1961, was probably intended as a substitute for nonsuits in nonjury trials, it is still not a nonsuit. (*Guttman* v. *Howard Homes, Inc.,* 241 Cal.App.2d 616, 618 [50 Cal.Rptr. 769].)

We have reviewed the superior court file (No. 881 100) pursuant to rule 12(a), California Rules of Court. The file does not contain findings of fact and conclusions of law. However, the clerk's minute order of January 13, 1971, states that no request for findings of fact and conclusions of law having been filed within the time prescribed by California Rules of Court, rule 232(b), counsel for defendants were directed to prepare and serve proposed judgment pursuant to rule 232(h). A copy of the minute order was mailed to counsel for all appearing parties. ■ Lack of formal written findings of fact and conclusions of law was not raised on appeal.

The trial court weighed the evidence, and its decision must be upheld on appeal if there is any substantial evidence sufficient to sustain it. (See *Elzey* v. *Metropolitan Builders, Inc.,* 16 Cal.App.3d 71 [92 Cal.Rptr. 461]; *East-West Capital Corp.* v. *Khourie,* 10 Cal.App.3d 553, 556 [89 Cal.Rptr. 369].)

---

[4]Section 631.8 "After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, in which case the court shall make findings as provided in Sections 632 and 634 of this code, or may decline to render any judgment until the close of all the evidence. Such motion may also be made and granted as to any cross-complaint.

"If the motion is granted, unless the court in its order for judgment otherwise specifies, such judgment operates as an adjudication upon the merits."

Accordingly, we hold in the case at bench that no formal written findings of fact and conclusions of law are required and that the judgment for defendants under Code of Civil Procedure section 631.8 is amply supported by the implied findings and substantial evidence.

## CONCLUSION

The case at bench is a striking illustration of difficulties an American businessman may encounter in proving up a case in a California court[5] arising out of a business venture in Mexico which involves an attempt to acquire real property in Mexico through a complicated legal subterfuge, even when represented by both Californian and Mexican attorneys. The business venture having failed, and apparently unable to sue in Mexican courts, he seeks assistance of the California courts to recoup his losses and unspin the web so carefully and apparently illegally spun in Mexico.

We have not directly applied the unclean hands doctrine to the case at bench. ▋ This doctrine, in general, prescribes, at law and in equity, that the courts will not aid either party to a transaction which is illegal or contrary to public policy where the parties are equally at fault, but will leave the parties where it finds them. However, California procedure and substantive law, coupled with the conflicts-of-laws and the "doctrine of comity," have operated to strip away national boundaries in the application of this maxim of jurisprudence in the instant case. We leave the parties where we found them.

Judgment affirmed.

Wood, P. J., and Thompson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 3, 1975.

---

[5]This does not mean that a person innocently defrauded into believing he can own or lease certain Mexican land cannot seek redress in California courts. Each case must be decided on its own facts.