51 F.3d 810
 RICO Bus.Disp.Guide 8775
 William T. BRADY; James Cardwell; Dar-Kel Corporation,
Plaintiffs-Appellees,
v.
Chester P. BROWN, Defendant,
and
Lorna Brown de Mena; Eric Brown Castelazo; Nelly Lozano de
Brown, Defendants-Appellants,
and
Maria de Los Angeles Castelazo de Brown,
Defendant-Counter-Claimant-Appellant,
v.
HOTEL LAS ARENAS, S.A. de C.V., Counter-Defendant-Appellee.
William T. BRADY; James Cardwell; Dar-Kel Corporation,
Plaintiffs-Appellees,
v.
Chester P. BROWN, Defendant-Cross-Claimant-Appellant,
v.
HOTEL LAS ARENAS, S.A. de C.V., Cross-Defendant-Appellee.
 Nos. 93-55669, 93-55683.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 6, 1994.
Decided March 21, 1995.
 
 Chester P. Brown, Alpine, CA and Darrell L. Johnson, Los Angeles, CA, for defendants-appellants.
 Todd M. Sloan, Hennelly & Sloan, Pacific Palisades, CA and Neil D. Martin, Hill, Farrer & Burrill, Los Angeles, CA, for plaintiffs-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before: FLETCHER, BOOCHEVER, and FERNANDEZ, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 
 1
 California businessmen Brady and Cardwell invested in Mexican coastal land and the construction of a hotel with the help of Brown, an American citizen and Mexican resident licensed to practice law in Mexico. Because Mexican law does not allow direct foreign ownership of coastal property, Brown arranged for Mexican citizens to buy the property with funds contributed by Brady and Cardwell. Through a complex series of agreements and transactions directed by Brown, Brown and his family eventually acquired controlling interests in the land, the hotel, and the hotel corporation. When Brown's family took control over the hotel, Brady and Cardwell sued Brown and his family in federal district court in California. Brown's family counterclaimed.
 
 
 2
 After a bench trial of Brady and Cardwell's claims, the district court found Brown liable for fraud and ordered him to execute a power of attorney to an agent to transfer the property into a trust approved by the Mexican government, for the benefit of Brady and Cardwell. The other defendants were also ordered to transfer their interests into the trust, to avoid unjust enrichment. The court granted summary judgment for Brady and Cardwell on the counterclaim. Brown and his family appeal. We affirm. In this opinion we address only the jurisdictional and comity issues involved in this case. We have decided the remaining issues in a memorandum disposition filed simultaneously with this opinion.
 
 FACTS AND PROCEDURE
 
 3
 In 1969, California businessmen William T. Brady ("Brady") and James Cardwell ("Cardwell") decided to acquire coastal land in Mexico. Through Guido Natali ("Natali"), a Mexican attorney, Brady and Cardwell learned that a parcel of more than 3300 hectares[1] with seventeen kilometers of beachfront on the Gulf of California (the "Boca property") was available. Brady and Cardwell retained Fred A. Orleans ("Orleans"), a lawyer licensed to practice in Texas and in Mexico, to help them obtain an interest in the Boca property. Orleans hired Chester Brown ("Brown"), the appellant in this action, to perform services in Mexico in connection with the purchase and development of the land. Brown is a United States citizen, a resident of Mexico, and a United States-trained lawyer licensed to practice in Mexico.
 
 
 4
 In early September 1969, Brown advised Orleans that foreigners could not hold an ownership interest in the Boca property. The Boca property was in Mexico's "Forbidden Zone," an area within fifty kilometers of the shore in which the Mexican Constitution prohibited foreigners from acquiring ownership interests. Based on advice from Brown, Orleans wrote Brady and Cardwell proposing the formation of a corporation wholly owned by Mexican citizens to acquire the land:
 
 
 5
 It should be kept in mind that legally you can never own shares in the land owning corporation and while there are instances where Mexican citizens have permitted foreigners to use their names to acquire land in the forbidden zone, thus violating the Mexican Constitution, this should not be done. Instead you can obtain better results by associating with bona fide Mexican investors to develop the land and taking their just share in the profits.
 
 
 6
 Orleans wrote Brown, identifying Brady, Cardwell, and the Mexican participants in the proposed transaction. Brown drew up three agreements, each called "Contract of Association in Participation," sending a draft to Brady on October 24, 1969. In an accompanying letter, Brown advised Brady:
 
 
 7
 [I]t would be a serious mistake to attempt to purchase land in the forbidden zone in open defiance of the Mexican Constitution. To use Mexicans who are willing to lend you the use of their names as a subterfuge would merely lay you open to the eventual confiscation of the land if the authorities became aware of the subterfuge....
 
 
 8
 . . . . .
 
 
 9
 I believe you can accomplish what you want without violating any law whatsoever by resorting to the use of legitimate contractual relations. Your purpose in any case is to promote the use and sale of the land, and possibly its prior development. It is quite common for promoting and developing groups to associate with property owners to develop land and after recovering their costs, to share the profits with the owners.
 
 
 10
 Brady, Cardwell, and the four Mexican citizens selected by Orleans (three lawyers associated with Orleans, and Natali's wife) signed the agreements on November 3, 1969 (the "November 1969 agreements"). The November 1969 agreements provided that the Mexican citizens would purchase the Boca property with money[2] contributed by Brady and Cardwell, and would eventually sell or lease the land to Mexican corporations that would be formed to hold and develop the property. The agreements also gave Brown irrevocable powers of attorney from the Mexican citizens over future transactions. The four Mexican citizens purchased the entire Boca property shortly thereafter. Later in November, Brown ended his relationship with Orleans and became Brady and Cardwell's lawyer.
 
 
 11
 In 1972, the Mexican government published new controls forbidding the use of "straw men," Mexican citizens who would hold title to Forbidden Zone property for foreigners. The regulations, which became law in 1973, authorized the Ministry of Foreign Affairs to grant permits to Mexican credit institutions to buy in trust coastal land intended for tourist activities, to be held for the benefit of foreign nationals such as Brady and Cardwell (an arrangement called a "fideicomiso"). The new law also required the Ministry's authorization before a foreigner could acquire or lease more than 25% of the capital, or 49% of the assets of a business enterprise.
 
 
 12
 Brown sent a copy of the regulations to Brady and Cardwell, but did not advise them to create a trust. Although the law as eventually enacted provided that those required to register their investments had 180 days in which to do so,[3] Brown told Brady and Cardwell they could not benefit from such an arrangement. Instead, he counseled Brady and Cardwell that the new regulations prevented them from owning more than 49% of any Mexican business or enterprise, and advised them to sign a new Contract of Association in Participation.
 
 
 13
 Subsequently, through a complex series of transactions, Brown used his power of attorney to orchestrate the transfer of the property to his family and to business entities controlled by his family, all of whom were Mexican citizens. First, on December 15, 1972, Brady and Cardwell signed the new participation contract, which transferred partial ownership of the Boca property to Brown's son, Eric Brown, and Brown's wife, Maria Brown.
 
 
 14
 In early 1973, Maria Brown entered into an agreement with Robert Gooden ("Gooden"), a U.S. citizen, for hotel development on 32 hectares of her Boca property. Gooden formed a California limited partnership, Bahia Ventana Company ("Bahia"), which then formed with Maria Brown a Mexican limited partnership, Cueva del Leon, in which Maria Brown was the general partner with a 51% interest, and Bahia was the limited partner with a 49% interest. Maria Brown invested no money, and made no decisions regarding the partnership.
 
 
 15
 In 1975, Brown exercised his power of attorney to transfer to his daughter, Lorna Brown, the remaining interest in the Boca property. The district court found that the Brown defendants paid a total of only $19,200 for the entire Boca property, while Brady and Cardwell eventually invested over $1 million in the purchase and development of the Boca land.
 
 
 16
 Gooden withdrew from the hotel development project in 1977, and Brady and Cardwell acquired his interest in the project and in Bahia. Later in the year, Dar-Kel Corporation ("Dar-Kel"), a California corporation formed by Brady and Cardwell, signed a contract styled as a non-recourse loan to Maria Brown, transferring funds to Mexico to build the Hotel Las Arenas ("Hotel"). Construction continued from 1977 to 1980.
 
 
 17
 In 1980, Cueva del Leon became a Mexican corporation, Hotel Las Arenas, S.A. de C.V. (the "Hotel corporation"), with Maria Brown as its majority shareholder. That same year, Maria Brown, as administrator of the Hotel corporation, signed a "Commission Agency Contract" with Dar-Kel, to provide a method for Dar-Kel to receive funds from the Hotel's operation. She also executed a contract related to the loans from Dar-Kel and leased the Hotel to the Hotel corporation. All this was done under Brown's direction, with the ostensible purpose of giving Brady and Cardwell the benefits of ownership without any conflict with Mexican law.
 
 
 18
 The Hotel opened in 1980. After several years of operation, Brady and Cardwell argued with Brown and Maria Brown regarding ownership and management issues. In 1985, Maria Brown called a shareholders meeting of the Hotel corporation, and claimed control of and title to the Hotel as majority shareholder.
 
 
 19
 In September 1985, Brady, Cardwell, and Dar-Kel filed suit against Brown, Maria Brown, Eric Brown, Lorna Brown, and Nelly Brown (Eric Brown's wife)[4] alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sec. 1962(b) and (c), and state law claims of fraud, conversion, constructive trust, and breach of fiduciary duty. Brown filed a cross-claim against the Hotel Las Arenas corporation, and Maria Brown filed a counterclaim against Brady, Cardwell, and Dar-Kel, alleging RICO violations and fraud.
 
 
 20
 After an early settlement fell through, the case was eventually tried before the district court from October 5, 1988, to January 17, 1990. The court issued findings of fact and conclusions of law in final form on February 3, 1992. The district court granted summary judgment to Brady and Cardwell on Maria Brown's counterclaim on September 10, 1992. Brown's cross-claim was dismissed on January 31, 1993.[5] Final judgment was entered March 26, 1993. The court found Brown liable for fraud, and found the other Brown defendants were not bona fide purchasers of the Hotel and the Boca property. As a remedy, the district court imposed a constructive trust to avoid unjust enrichment, ordering all the defendants to execute irrevocable powers of attorney to an agent to transfer the Hotel and the Boca property into a Mexican government-approved trust, or "fideicomiso," for the benefit of Brady and Cardwell.
 
 
 21
 Chester Brown appeals from the final judgment as do the other Browns (hereinafter collectively referred to as Brown's family), who also appeal from the district court's grant of summary judgment on their counterclaim.
 
 DISCUSSION
 I. Jurisdiction
 
 22
 The district court assumed jurisdiction on two grounds, diversity of citizenship and federal question (the RICO claims). Brown, who is representing himself, challenges both.
 
 A. Diversity of citizenship
 
 23
 This court reviews the existence of subject matter jurisdiction de novo. Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 554 (9th Cir.1992).
 
 
 24
 Brown argues that no diversity of citizenship exists because of his status as a United States citizen residing in Mexico. "In order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States and be domiciled within the State." Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 828, 109 S.Ct. 2218, 2221, 104 L.Ed.2d 893 (1989). Because Brown was domiciled in Mexico, he was thus neither a "citizen of a state" nor an alien under 28 U.S.C. Sec. 1332(a)(3), which confers jurisdiction when a citizen of one state sues both aliens and citizens of other states. Nor was he an alien for the purposes of 28 U.S.C. Sec. 1332(a)(2), which confers jurisdiction when a United States citizen sues aliens only. Brown's presence as a defendant thus destroyed the complete diversity required for federal jurisdiction. See Newman-Green, Inc., 490 U.S. at 828-29, 109 S.Ct. at 2220-21.
 
 
 25
 We find there was no diversity jurisdiction.
 
 B. Pendent jurisdiction
 
 26
 The district court's alternative ground for jurisdiction was its federal question jurisdiction over the RICO claims, under which it could exercise supplemental jurisdiction over Brady and Cardwell's state law claims. Brown argues that the RICO claims were withdrawn and that the court never actually exercised its pendent jurisdiction over the state claims.[6]
 
 
 27
 Pendent jurisdiction over state claims exists when the federal claim is sufficiently substantial to confer federal jurisdiction, and there is "a common nucleus of operative fact between the state and federal claims." Gilder v. PGA Tour, Inc., 936 F.2d 417, 421 (9th Cir.1991). The ultimate lack of merit of the federal claim does not mean that pendent jurisdiction cannot attach; the federal claim must be "absolutely devoid of merit or obviously frivolous" to divest the court of pendent jurisdiction. Id. The court may retain jurisdiction even if the federal claims over which it had original jurisdiction are dismissed. See Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1309 (9th Cir.1992) (affirming the district court's retention of state law claims after RICO claim was dismissed), cert. denied, --- U.S. ----, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). The decision to retain jurisdiction over state law claims is within the district court's discretion, weighing factors such as economy, convenience, fairness, and comity. Id. This court reviews that decision for a clear error of judgment. Id.
 
 
 28
 Here, Brady and Cardwell's RICO claims alleged that the Browns maintained an interest in and control of an enterprise (the Hotel) through a pattern of racketeering, in violation of 18 U.S.C. Sec. 1962(b), and that the Browns (except Nelly) violated 18 U.S.C. Sec. 1962(c) by using the funds from their pattern of racketeering to establish and conduct an enterprise to damage Brady and Cardwell in their business. The operative facts for both the RICO and the state law claims are the same actions described above, specifically the Browns' manipulation of the title to and profits from the Boca property. There was thus a common nucleus of operative fact encompassing both the state and federal claims. Further, these claims were not frivolous or insubstantial. The district court thus could consider whether a return to state court would have been a waste of judicial resources when the case had been in federal court for some time. The district court decided to retain the state claims based in part on the efforts already expended by counsel.
 
 
 29
 We find it was not a clear error of judgment to retain pendent jurisdiction over the state law claims.
 
 II. Comity
 
 30
 Brown argues that Brady and Cardwell's actions, and the court's eventual remedy, violated the Mexican prohibition of the ownership of coastal land by foreigners. Brown's family joins in his argument. Brown asserts that the California law[7] of comity requires the district court to apply Mexican law, and therefore to refuse to grant Brady and Cardwell any interest in the property. This court reviews the district court's interpretation of foreign law de novo. Richmark Corp. v. Timber Falling Consultants, 959 F.2d 1468, 1473 (9th Cir.), cert. dismissed, --- U.S. ----, 113 S.Ct. 454, 121 L.Ed.2d 325 (1992).
 
 
 31
 The doctrine of comity is based on "respect for the sovereignty of other states or countries," and under it "the forum state will generally apply the substantive law of a foreign sovereign to causes of action which arise there." Wong v. Tenneco, Inc., 39 Cal.3d 126, 216 Cal.Rptr. 412, 417, 702 P.2d 570, 575 (1985). California courts therefore defer to Mexico's laws prohibiting foreign ownership or control of Mexican land. Id.
 
 
 32
 At the time that Brady and Cardwell entered into the November 1969 agreements drafted by Brown, Article 27, Section I of the Mexican Constitution provided: "Under no circumstances may foreigners acquire direct ownership of lands or waters within a zone of ... fifty kilometers along the shores of the country." Acts done and contracts made in violation of the prohibition were absolutely void. Later legislation continued to limit foreign investment: Article 7 of the Law to Promote Mexican Investment and to Regulate Foreign Investment, effective in March 1973, repeated the prohibition on coastal land ownership. Article 5 precluded foreign investors from controlling Mexican businesses or owning more than 49% of their capital. Article 8 provided that foreign investors could acquire more than 25% of the capital or over 49% of the assets of a Mexican enterprise with proper governmental authorization, and that "[a]ctions undertaken without such authorization shall be null and void." Article 18 allowed Mexican credit institutions to hold Mexican coastal lands intended for tourist development in trust for foreign beneficiaries, subject to government approval.[8]
 
 
 33
 California courts have deferred to Mexican law and declined to enforce California citizens' claims of ownership of Mexican property and businesses in violation of Mexican law. In Stockton v. Ortiz, 47 Cal.App.3d 183, 120 Cal.Rptr. 456 (1975), a California businessman created two Mexican corporations to take title to coastal property in Mexico, and operated a motel business on the property. When the business suffered adversity, Stockton sued to recover his investment. Because he was not listed anywhere as having a legal interest in the corporations that owned the property, the California Court of Appeal held that he had no derivative cause of action. Id. 120 Cal.Rptr. at 462. It also held that the attempt to acquire the land through the corporations was illegal and void under the Mexican Constitution and laws in effect before 1973. Id. 120 Cal.Rptr. at 462-63. While citing the principle of comity as justification for denying any relief and for "leav[ing] the parties where we found them," id. 120 Cal.Rptr. at 466, the court noted: "This does not mean that a person innocently defrauded into believing he can own or lease certain Mexican land cannot seek redress in California courts. Each case must be decided on its own facts." Id. 120 Cal.Rptr. at 465 n. 5.
 
 
 34
 Also citing comity considerations, the California Supreme Court in Wong denied recovery to a California grower who lost his illegal farming operation in Mexico. Wong used Mexican citizens as front men to lease farmlands and hold title in and run his produce farming operation in Mexico, an arrangement Wong knew violated Mexican law. Wong's marketing agreement with a produce broker soured when the broker bypassed Wong to remit the sales proceeds directly to the Mexican growers, treating them as the true owners of the farming operation. After a jury verdict for Wong in his action for breach of contract against the produce broker, the trial judge barred Wong from recovery because the entire arrangement was illegal under Mexican law. 216 Cal.Rptr. at 414-16, 702 P.2d at 572-74.
 
 
 35
 The California Supreme Court affirmed, holding that "[t]he trial court properly declined to involve our courts in this flagrant effort to circumvent Mexican law." Id. at 417, 702 P.2d at 575.[9] "Comity teaches that a contract ... made with a view of violating the law of another country, though not otherwise obnoxious to the law ... of the forum ... will not be enforced," id. at 418, 702 P.2d at 576 (quotations omitted), and Wong's violation of Mexican law rendered all his transactions related to the Mexican operation illegal. Id. at 420, 702 P.2d at 578. As in Stockton, the court left the parties where it found them.
 
 
 36
 Brown argues that because Brady and Cardwell attempted to acquire ownership interests in violation of Mexican law, all of their actions were null and void, and the district court should have followed Wong and Stockton to leave the parties where they were (in this case, apparently with Brown's family holding title to the Boca land, and the controlling interests in the Hotel and the Hotel corporation). Brady and Cardwell seek to avoid the application of Wong and Stockton on several grounds. First, they sued for fraud, not for breach of contract. Second, they argue that the relief ordered does not offend comity, as Mexican law authorizes such trust arrangements.
 
 A. Fraud
 
 37
 Brady and Cardwell distinguish their fraud action from Wong and Stockton, in which the plaintiffs attempted to enforce contracts that were illegal under Mexican law. They point out that the California courts did not bar recovery for fraud in either case: in Wong the plaintiff made no fraud claim similar to Brady and Cardwell's,[10] and the Stockton court considered the plaintiff's fraud allegation and found it without merit, because Stockton knew of the legal problems with holding title to Mexican lands. Stockton, 120 Cal.Rptr. at 465. They point out that Stockton suggested the possibility that an innocent party could maintain a fraud action. Id. 120 Cal.Rptr. at 465 n. 5.
 
 
 38
 We find that this argument has merit. Stockton expressly reserves judgment on whether an innocent party could maintain a suit for fraud, stating that "[e]ach case must be decided on its own facts." Id. Wong leaves open the question whether comity would bar an action for fraud, emphasizing that in Wong's case his "purposeful violation of Mexican law is clear" because Wong, far from attempting to comply with the law, "concocted an elaborate scheme" to deceive the Mexican authorities. 216 Cal.Rptr. at 418, 702 P.2d at 576. The court found that Wong entered into the marketing contract "with full knowledge that the farming operations upon which the agreement depended were being carried out in violation of Mexican law." Id. at 417, 702 P.2d at 575.
 
 
 39
 In this case, Brady and Cardwell do not allege that Brown breached any of the contracts related to the Boca property, and the district court did not find that those contracts were illegal under Mexican law. Instead, the fraud claimed by Brady and Cardwell and found by the district court is that Brown advised Brady and Cardwell to sign the 1969 agreement, assuring them that it was entirely legal; three years later, when the new Mexican foreign investment law was published, he misrepresented to them that they could not profit from a trust arrangement under the new Mexican law; and instead of suggesting such a trust, Brown manipulated the subsequent agreements to transfer all the rights in the property to him and his family and to the detriment of Brady and Cardwell, claiming throughout that he was doing so to comply with Mexican law.
 
 
 40
 On the facts as found by the district court, the doctrine of comity does not require us to apply Mexican law to bar Brady and Cardwell from recovering on their fraud claim.
 
 B. The nature of the relief
 
 41
 Brown and the other defendants argue that the relief ordered by the district court violates Mexican law, because the district court attempted to give Brady and Cardwell "all of the attributes of ownership of the Boca land." The court did not do so. Instead, it ordered Brown to execute a power of attorney so that the defendants' interest in the land and the Hotel could be transferred into a trust with a bank approved by the Mexican government for the benefit of Brady and Cardwell.
 
 
 42
 The remedy devised by the district court is essentially a "fideicomiso," authorized by Article 18 of the 1973 foreign investment law. Brown's statement to Brady and Cardwell that they could not benefit from such a trust is a basis of the district court's finding of fraud. Such an arrangement, if it can be accomplished, does not violate Mexican law.
 
 
 43
 Moreover, the district court retained jurisdiction to consider alternative remedies if the trust could not be established under Mexican law. We find that the district court's judgment did not violate Mexican law.
 
 
 44
 C. The Brown defendants other than Chester Brown
 
 
 45
 Brown's family claims that because the district court found that only Chester Brown was liable on the fraud claim, Wong and Stockton bar the action against his family, because the contracts were illegal under Mexican law. The district court, however, did not find that the various contracts were illegal. Rather, the court granted Brady and Cardwell relief against Brown's family on the basis of unjust enrichment. The court's finding of unjust enrichment is affirmed in the memorandum disposition filed concurrently with this opinion.
 
 
 46
 Wong and Stockton do not bar the action against Brown's family.
 
 CONCLUSION
 
 47
 The district court properly exercised pendent jurisdiction over Brady and Cardwell's state law claims. Wong and Stockton do not bar Brady and Cardwell from recovering against Brown and his family. We AFFIRM the district court's judgment after trial in favor of Brady and Cardwell and its grant of summary judgment against Maria Brown on her counterclaim.
 
 
 
 [1]
 A hectare is a unit of land measure equal to 10,000 square meters, or 2.471 acres. The land eventually transferred amounted to 3570 hectares
 
 
 [2]
 The November 1969 agreements state that Brady and Cardwell would provide $100,000; the complaint alleges $93,000
 
 
 [3]
 The third "Transitory Article" of the 1973 law provides: "Persons obliged to register with the National Registry of Foreign Investments shall do so within 180 days of the date on which this law goes into effect." The Second "Transitory Article" gives foreign investors in Mexican businesses 180 days to convert their shares into nominal securities allowed by the law
 
 
 [4]
 Although the court's findings of fact of February 3, 1992, do not state this, the complaint alleged that, as Eric Brown's wife, Nelly Brown acquired part of the Hotel Las Arenas corporation stock
 
 
 [5]
 Brown does not appeal the dismissal of his cross-claim
 
 
 [6]
 It is unclear from the record exactly what was the disposition of the RICO claims in the district court. The record refers to the claims as stayed by stipulation, but we can find no document showing the fate of the RICO claims, and the parties cannot point to any record of the stay or of an eventual dismissal. Because the district court clearly believed it was rendering a final disposition of all Brady and Cardwell's claims, and because at oral argument in this court the parties agreed to dismiss the RICO claims, we find we have jurisdiction over this appeal as from a final judgment of the district court, under 28 U.S.C. Sec. 1291
 
 
 [7]
 Brown does not dispute the district court's conclusion that California law applies to the comity issue. We thus apply California law to determine whether comity considerations bar Brady and Cardwell's state law claims
 
 
 [8]
 The 1973 "Law to Promote Mexican Investment and to Regulate Foreign Investment" provides:
 ARTICLE 5.... In cases where legal provisions or regulations do not specify a given percentage, foreign investment may hold up to 49 percent of the capital of business enterprises provided it is not empowered, by any title, to control the management of the business enterprise.
 ARTICLE 7. Foreigners, foreign companies, and Mexican companies without an exclusion of foreigners clause may not acquire direct dominion (title) over land and water in a 100-kilometer strip along the country's borders or in a 50-kilometer strip inland from its coast.
 Foreign companies may not acquire dominion over land and water or obtain concessions for water exploitation.
 Foreign individuals may acquire dominion over the properties to which the preceding paragraph refers by permission from the Ministry of Foreign Affairs and after signing the agreement to which Section 1, Paragraph 4, of Article 27 of the Political Constitution of the United Mexican States refers.
 ARTICLE 8. Authorization by the corresponding Ministry, according to the economic activity involved, shall be required where one or more of the individuals or companies to which Article 2 refers, in one or several actions, or a succession of actions, acquires or acquire more than 25 percent of the capital, or over 49 percent of the fixed assets of a business enterprise. The leasing of a business enterprise or of essential assets required for its functioning, shall be considered equivalent to the acquisition of assets.
 Also requiring authorization are actions by which the administration of a business enterprise is acquired by foreign investors, or by which foreign investment is empowered, by any title, to control the management of the business enterprise.
 The authorization to which this Article refers shall be granted when it is considered in the interest of the country, pursuant to ruling by the National Commission of Foreign Investment.
 Actions undertaken without such authorization shall be null and void.
 ARTICLE 18. In accordance with Section 1, Article 27, of the Political Constitution of the United Mexican States and its Organic Law, the Ministry of Foreign Affairs is hereby empowered to decide, in each case, the advisability of granting credit institutions the authorization to acquire in trust the title to real estate intended for industrial and tourist activities, within a strip of 100 kilometers wide along Mexico's borders and 50 kilometers wide inland from its coasts, provided that the purpose of the acquisition is to permit the use of such real estate by the trust beneficiaries without thereby creating ownership rights over it. For this purpose the trustee may issue nominal, nonamortizable participation certificates.
 National Commission for Foreign Investment, Foreign Investment: Legal Framework and its Application (1986).
 
 
 [9]
 The court also noted that although the 1973 Law to Promote Mexican Investment and to Regulate Foreign Investment was not in effect when Wong began operation, he could have complied with the law by registering during the 180-day grace period provided for in the transitional rules. 216 Cal.Rptr. at 415 n. 2, 702 P.2d at 573 n. 2
 
 
 [10]
 Wong's contract suit was against the produce broker who had bypassed him to deal directly with the Mexican citizens holding title to the farmland; he did not name the Mexican citizens themselves