Filed 9/12/14  Judicial Council Coordination Proceedings 4435 – TPC Cases CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| JUDICIAL COUNCIL COORDINATION PROCEEDINGS 4435 - TPC CASES, | E052246 / E053537<br><br>(Super.Ct.Nos. JCCP4435 & SCVSS120627)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Donald R. Alvarez, Judge.  Affirmed.

Miller, Axline & Sawyer, Duane C. Miller, Michael Axline, A. Curtis Sawyer, Jr., Tracey L. O'Reilly, and Evan Eickmeyer for Plaintiff and Appellant.

Becherer Kannet & Schweitzer, Patrick J. Becherer, Mark S. Kannett, Susan P. Beneville and Paul S. Lecky for Defendant and Respondent, Wilbur Ellis Company.

1

Horvitz & Levy, David M. Axelrod, Jason R. Litt, Felix Shafir; Steptoe & Johnson, Lawrence P. Riff, Jay E. Smith; King & Spalding, Robert E. Meadows and Tracie J. Renfroe for Defendant and Respondent, Shell Oil Company dba Shell Chemical Company.

I

INTRODUCTION

In the decades between the 1940's and the 1980's, Redlands farmers used soil fumigants, or nematicides,[1] on their agricultural crops. TCP[2] and DBCP[3] are two chemical compounds contained in the products, D-D and Nemagon, manufactured by Shell Oil Company (Shell). DBCP was banned in 1977. TCP was withdrawn from use after 1984. DBCP was found in Redlands wells in 1986 and TCP was detected in 2002.

In 2004, the City of Redlands (City) sued Shell, Wilbur-Ellis Company (Wilbur-Ellis), and other defendants for allegedly contaminating the City's wells and water supply. The City contended Shell was on notice of the dangers to Redlands groundwater posed by TCP and DBCP. Shell argued the trace levels of TCP and DBCP found in Redlands wells were not hazardous, that the City represented its water was safe for consumers, and that any TCP contamination came from a nearby Lockheed aerospace facility. Wilbur-Ellis

---

[1] Nematodes are microscopic worms that infest plant roots and inhibit crop production.

[2] 1,2,3-Trichloropropane.

[3] 1,2-dibromo-3-chloropropane.

contended there was no admissible evidence it was a wholesaler supplier of Shell soil fumigants in Redlands.

The trial court granted Wilbur-Ellis's motion for summary judgment and Shell's motion for summary adjudication on the City's claims for nuisance and trespass. The jury trial proceeded on the City's claims for strict liability and negligence against Shell. The jury did not find that Shell's product design, failure to warn, or negligence was a "substantial factor in causing harm" to the City.

The City's appeal challenges the summary judgment granted in favor of Wilbur-Ellis and the subsequent judgment in favor of Shell entered after the motion for summary adjudication and the trial by jury. The City also contends the trial court erred in denying its motion to tax costs. After a comprehensive review of the voluminous record, we affirm the judgments in favor of Shell and Wilbur-Ellis.

II

BACKGROUND

The trial of this action lasted three months and generated a 27-volume reporter's transcript and 53 volumes of appendixes. The City did not include a "summary of significant facts" with citations to the record, as required by California Rules of Court, rule 2.04(a)(2)(c). Instead, the City offered two pages of citations to the record, limited to the issue of Shell's notice between 1960 and 1981 about the dangers of groundwater

3

contamination caused by soil fumigants.[4]  In contrast, Shell submitted 15 pages of factual summary.

The City must demonstrate that it probably would have prevailed absent error based on "an examination of the entire cause, including the evidence."  (Cal. Const., art. VI, § 13.)  As the appellant, the City bears the duty of spelling out in its brief exactly how the error caused a "miscarriage of justice."  (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337.)  Otherwise, an appellant waives its right to have its appeal heard on the merits.  (E.g., *Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 50; *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.)  We regard "the facts in the light most favorable to the jury's verdict, resolving all conflicts and indulging all reasonable inferences to support the judgment."  (*Green Wood Industrial Co. v. Forceman International Development Group* (2007) 156 Cal.App.4th 766, 769-770, fn. 2)  We briefly summarize the facts as follows.

TCP, a chemical compound, was a trace ingredient in the Shell soil fumigant, D-D. DBCP was an ingredient in the Shell soil fumigant, Nemagon.  Shell manufactured and marketed soil fumigants in California from the 1940's until 1984.  DBCP was prohibited in 1977.  TCP was withdrawn in 1984.

In the second amended complaint, the City asserted causes of action against Shell and Wilbur-Ellis for strict liability, negligence, nuisance, and trespass.  The City alleged

---

[4]  The City reserved most of its record citations for its reply brief.

that TCP was an inert ingredient that had no effect on nematodes and a carcinogenic waste that Shell "disposed of" by adding to D-D and that it posed a risk of contaminating groundwater. The City alleged that DBCP in Nemagon was also carcinogenic and posed a risk of contaminating groundwater. The City maintained that TCP and DBCP in City wells interfered with its ability to use the water in those wells for drinking water.

At trial, the evidence showed DBCP was detected in the City's wells in 1986. Minute levels of TCP were detected in the City's wells in 2002. The amounts detected were so low as to be considered insignificant, presenting a negligible cancer risk.

Ultimately, the City did not claim there were any adverse health effects from DBCP in Redlands drinking water. Instead, between 1999 and 2009, the City issued its annual Consumer Confidence Report in which it touted the quality and safety of the City's water while acknowledging the presence of trace amounts of DBCP. The City sought compensation for remediation because it asserts it needs to remove TCP and DBCP from 10 of its wells in order to provide sufficient potable water. The City sought to recover about $46 million for the cost of water treatment.

In its verdict, the jury did not find that Shell caused foreseeable harm to the City. The jury also did not find Shell was liable for a failure to warn or negligence causing harm to the City. Our analysis of this appeal is guided by our conclusion that the evidence did not show that Shell caused any harm to the City. For that reason, the City's arguments cannot succeed.

III

CAUSATION AND HARM

Causation is an essential element of the City's claims.  (*Setliff v. E. I. Du Pont de Nemours & Co.* (1995) 32 Cal.App.4th 1525, 1533 [negligence and strict product liability]; *Powell v. Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357, 363 [product liability based on failure to warn]; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 278-279 [negligence and trespass].)  The City must prove that a specific product caused the alleged water contamination.  (See *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982; *Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1415-1416; *Dumin v. Owens-Corning Fiberglass Corp.* (1994) 28 Cal.App.4th 650, 655.)

The absence of direct evidence of causation did not eliminate the City's burden of proving it.  (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 403).  The trial court must "determine what any evidence or inference *could show or imply to a reasonable trier of fact.*"  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856.) The City must show that the fact to be proved is more likely than not.  (*Id.* at p. 857.)  The law does not permit speculation, conjecture, imagination, or guesswork, or incomplete inferences to substitute for evidence—direct or circumstantial.  (*Saelzer v. Advanced Group 400* (2001) 25 Cal.4th 763, 775; *Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196.)

IV

THE CITY'S APPEAL CONCERNING SHELL

We agree with Shell that substantial evidence supports the jury's findings that Shell did not cause harm, meaning the City cannot show prejudice from the trial court's purported errors. Nevertheless, we will address the City's claims, remaining mindful of the City's failure to establish causation.

In its appeal of the judgment in favor of Shell, the City argues variously that the trial court should not have granted Shell's motion for summary adjudication of the City's nuisance and trespass claims and that the trial court erred in allowing the testimony of Shell's expert, Dr. John Wilson, about Lockheed, and in not allowing the City to amend its complaint to assert liability based on contamination by Lockheed. The City also argued the court erred in its evidentiary rulings and jury instructions and in allowing an affirmative defense, all causing cumulative error. The City urges particular errors related to Shell's "notice and knowledge" of its products' risks, the exclusion of the testimony of Thomas Stommel and Mark Canfield, the exclusion of exhibits 188 through 191, and a jury instruction on the risk-benefit defense.

Notably, the City does not explain how Shell has caused actual harm to the City's water. The burden to prove a product is not defective shifts to defendant only if plaintiff shows an injury proximately caused by the product's design. (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 431.) Thus, the purported errors are irrelevant because the jury did not find Shell had caused harm on any of three theories of liability—risk benefit,

7

failure to warn, and negligence.[5]  Because the jury did not find that Shell caused harm to the City, no error affected the trial.  Also rendered moot was the City's argument that the trial court erroneously granted summary adjudication on the City's nuisance and trespass claims.

## A.  *No Substantial Evidence of Causation*

In order to prevail, the City had to prove that Shell's soil fumigants were a substantial factor in causing harm.  (CACI Nos. 1204, design defect; 1205, failure to warn; and 1220, negligence.)  At trial, the City claimed that Shell's D-D and Nemagon caused harm to the City because TCP and DBCP from these products migrated into City wells needed to supply drinking water.

The chief obstacle to the City's argument is the substantial evidence demonstrating Redlands water was safe even though it contained trace levels of TCP and DBCP—either undetectable or below the maximum containment level (MCL) for DBCP, and far below the level for TCP which would render it unsafe as drinking water.  The only exception was the New York Street well in which the amount of DBCP fluctuated at just above, or slightly below, the MCL.  But in recent samples, the amount of DBCP was decreasing sharply, falling below the MCL.

---

[5]  The distinction between general and special verdicts is not necessary.  On all three theories of liability for both products, the jury did not find that Shell had caused harm.

8

Thus, the evidence shows the amounts of TCP and DBCP in the Redlands wells are so low that any theoretical risk is negligible and it would therefore be safe to serve those amounts in drinking water. As described by Shell, "a City resident would need to drink tens of thousands to millions of gallons of water containing TCP and DBCP *every day for 70 years* before the resident would be exposed to doses equivalent to the lowest doses given to rodents that have developed cancer after exposure to TCP and DBCP in the course of scientific studies."

In addition, the City contradicted its own position by asserting in its 2005 Urban Water Management Plan that its water would continue to be safe and reliable through 2030. In view of the minute levels of DBCP and TCP and the City's own concessions, substantial evidence demonstrated the City had a reliable drinking water supply through 2030, even without the wells at issue, and therefore did not need $46 million to treat TCP and DBCP in those wells to generate additional drinking water. In summary, the City does not refute the defense theories regarding lack of causation and harm. The City cannot show prejudice from legal errors when Shell caused no harm.

B. *Summary Adjudication of Nuisance and Trespass*

The City challenges the trial court's ruling dismissing its claims for nuisance and trespass. The City relies heavily on *City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28, 41-42, which held that dry cleaners who dumped solvents in the public sewers could be liable for nuisance but that defendants who simply manufactured or distributed a chemical cleaning solvent could not be held liable. In its

opening brief, the City asserts—citing its separate statement rather than the actual evidence—that the City "submitted detailed evidence . . . which showed (1) TCP was not a beneficial ingredient in Shell's soil fumigants, but was instead a hazardous waste generated by Shell's other manufacturing processes, (2) Shell would incur significant disposal costs if TCP was not dumped into Shell's soil fumigant products, and (3) Shell knew that TCP would contaminate groundwater once it was applied to soil as part of Shell's products."  The City does not discuss the "detailed evidence" until its reply brief. We conclude that Shell is not liable for nuisance or trespass, especially in light of the jury's verdict.

A nuisance is "the unreasonable, unwarrantable or unlawful use by an individual of his own property so as to interfere with the rights of others."  (*Wolford v. Thomas* (1987) 190 Cal.App.3d 347, 358.)  The law of nuisance, however, "is not intended to serve as a surrogate for ordinary products liability."  (*City of Modesto Redevelopment Agency v. Superior Court, supra,* 119 Cal.App.4th at p. 39, citing *City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575, 586.)  A trespass requires a physical entry or invasion onto the land and is narrower in definition than nuisance.  (*Wilson v. Interlake Steel Co.* (1982) 32 Cal.3d 229, 232-233; *Capogeannis v. Superior Court* (1993) 12 Cal.App.4th 668, 674.) The manufacturer, distributor, or supplier of a product is not liable for nuisance based on the manufacturing or distribution of an allegedly defective product or failing adequately to warn of the product's risks.  (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 306-308, 313; *City of Modesto,* at pp. 39, 42; *City of San Diego,* at pp.

10

578, 584-587.) Trespass, like nuisance, cannot be based on a manufacturer's sale of, or failure to warn about, an allegedly defective product.[6] (*Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 511-512.)

Shell did not participate in placing chemicals near the City's water supply. Unlike *City of Modesto*, where the defendant manufacturer instructed dry cleaners to discharge solvent into the drains and sewers (*City of Modesto Redevelopment Agency v. Superior Court, supra*, 119 Cal.App.4th at p. 41), Shell had no contact with the farmers who used Shell's soil fumigants. Shell's only instructions to the farmers were the labels attached to its products. As the trial court reasoned, a product label cannot form the basis for the affirmative acts necessary to establish a separate nuisance or trespass claim.

According to the City, Shell engaged in "affirmative acts" creating a nuisance by "disposing" of TCP in its products in order to avoid the cost of disposal. At trial, the City based its strict liability and negligence claims on the same theory as its nuisance and trespass claims, maintaining that Shell defectively made its product by including an unnecessary hazardous waste—TCP—for the purpose of saving money, and that the product's labels instructed users to apply the chemicals for agricultural use without

---

[6] The City discusses only the nuisance claim in its legal argument, therefore waiving any claim of error concerning the trespass claim. (See *Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1387.) The City's belated effort to raise a CERLCA (Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq.) argument for the first time in its reply is "doubly" waived. (*Lambert v. Carneghi* (2008) 158 Cal.App.4th 1120, 1135.)

11

adequate warnings. However, as explained in *Santa Clara*, the viability of a nuisance claim does not depend on whether the plaintiff can simply "allege[] that defendants did something more than merely manufacture and distribute a product;" instead, the viability of the claim depends on whether the core of the plaintiff's claim is more akin to a products liability claim seeking damage for injury caused by a product, or is more like a nuisance claim. (*County of Santa Clara v. Atlantic Richfield Co., supra*, 137 Cal.App.4th at p. 313.) The City characterized its nuisance and trespass claims as being based on a products liability theory.

Finally, the City's claim that Shell created a nuisance by purportedly "dumping" a nonessential chemical (TCP) into D-D for the purpose of saving money does not suffice. The City seeks damages for injuries caused to plaintiffs' property by a product; it is not a claim for trespass or nuisance. (*County of Santa Clara v. Atlantic Richfield Co., supra*, 137 Cal.App.4th at p. 313.) The trial court thus properly granted summary adjudication on the nuisance and trespass claims.

In any event, the City cannot show prejudicial error unless it is reasonably probable that the jurors would have reached a more favorable result on its alternative nuisance or trespass theory: "[i]t would be hypertechnical to remand this case for retrial as to the second count, when the determinative fact issues of that count have, on the fullest evidence, been resolved against appellants upon the other counts." (*Lewis v. Hinman-Ball & Bonner* (1957) 154 Cal.App.2d 710, 712-716; *Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1499-1500.) Here, "on the fullest evidence," the jury found in favor of Shell on the

12

strict liability and negligence claims, which necessarily included a finding that Shell did not cause the City harm.  Therefore, the City cannot show that the jury probably would have ruled in its favor on nuisance and trespass claims premised on the same underlying facts.  Even if the basis for the strict liability and negligence claims was factually distinct from the nuisance and trespass claims, the City had to prove Shell caused harm.  (CACI Nos. 2000, trespass, and 2020, nuisance.)  Because the jury did not find that Shell caused harm, the City suffered no prejudice from the dismissal of its nuisance and trespass claims. (See *Hanson v. Goldsmith* (1915) 170 Cal. 512, 518-519.)

*C.  Dr. Wilson's Expert Testimony*

The City contends the trial court erred by admitting Dr. John Wilson's expert testimony concerning the disposal of industrial TCP at the Lockheed facility in Redlands and the migration of TCP into Redlands wells.  We review the trial court's "ruling excluding or admitting expert testimony for abuse of discretion.  [Citations.]  A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.'  (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) . . . .  [¶]  'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.'  [Citations.]"  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

13

As the California Supreme Court warned, the trial court must be "cautious in excluding expert testimony. The trial court's gatekeeping role does not involve choosing between competing expert opinions. The high court warned that the gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.' (*Daubert v. Merrell Dow Pharmaceuticals, Inc.* [(1993)] 509 U.S. [579,] 595.) . . . . [¶] The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.' [Citations.] The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion. [Citation.] In short, the gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' (*Kumho Tire Co. v. Carmichael* [(1999)] 526 U.S. [137,] 152.)" (*Sargon Enterprises, Inc. v. University of Southern California, supra,* 55 Cal.4th at p. 772.)

Dr. Wilson is a professor of hydrology. He testified about how groundwater becomes contaminated and about the presence of DBCP and TCP in Redlands wells. In his opinion, the groundwater model developed by the City's expert, Dr. Stephen Wheatcraft, was wrong. Dr. Wilson concluded Dr. Wheatcraft did not correctly apply hydrogeology and made other errors about contamination moving west, the level of the aquifer, and future concentrations of contamination. In contrast, Dr. Wilson concluded that the concentrations of DBCP and TCP were decreasing and would not be detectable in five to 10 years.

As part of his analysis, Dr. Wilson also examined Lockheed as another source of contamination. Dr. Wilson reviewed government reports and other literature which indicated that the aerospace industry was a source of TCP. He discovered that Grand Central Rocket, the company that preceded Lockheed at the site, had used a polymer, LP-33, containing TCP. TCP had been disposed of in a burn pit at the Lockheed site for about 20 years from 1954 to 1974. Dr. Wilson investigated whether TCP used at Lockheed could migrate to Redlands wells. Dr. Wilson reviewed government reports about the TCE[7] and percholate plumes occurring in Redlands in the 1980's and 1990's. He determined that, if TCE used by Lockheed was present in the aquifer, TCP used by Lockheed would also be present. In his scientific opinion, TCP, like the TCE plume, had contaminated the Redlands wells.

---

[7] Tricholoroethylene.

15

In its opening appellate argument, the City cites to its own motions in limine and for new trial to argue that Wilson's opinions were based on speculation, conjecture, guesswork, and hearsay, and were inadmissible. (Evid. Code, § 801; *Exxon Corp. v. Superior* Court (1997) 51 Cal.App.4th 1672, 1683; *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135-1136.) In particular, the City accuses Dr. Wilson of beginning with the premise that TCP from the Lockheed site caused the contamination and "working backward" to construct the basis for his opinion. (*Soils v. Southern Cal. Rapid Transit Dist.* (1980) 105 Cal.App.3d 382, 389.)

Having reviewed Dr.Wilson's trial testimony, rather than the City's memoranda supporting its motions, we disagree with the City's criticisms. Far from being unfounded, Dr. Wilson's opinions are based on his survey of the scientific literature and history. The information he cites in his testimony is also cited at trial in many other places. Other evidence and testimony established that TCP has been used in rocket fuel by the aerospace industry. Lockheed had operated a facility in Redlands, processing and testing rocket fuel until 1974. Lockheed disposed of waste from LP-33, containing TCP, by dumping it into an unlined burn pit, resulting in a plume of contaminants migrating into the groundwater.[8] Perchlorate and TCE were also dumped in the Lockheed burn pit. TCP, Perchlorate, and TCE have been found in City wells. When TCP is present in groundwater with perchlorate

---

[8] Dr. Wilson acknowledged no test was made for TCP during a 1980's investigation.

16

or TCE, or both, it comes from an aerospace industrial source.  One expert witness, John O'Connor, testified that, given the presence of TCP, perchlorate, and TCE in City wells, the TCP in the Redlands wells came from the Lockheed site.

Thus, substantial evidence supports Dr. Wilson's conclusions that TCP was present and used at the Lockheed facility and made its way into the Redlands groundwater. Furthermore, a party's assertion that an expert's opinion is unsubstantiated is a challenge, not to the admissibility of the expert's testimony, but rather to the weight to be given the opinion.  (*Douglas v. Ostermeier* (1991) 1 Cal.App.4th 729, 739.)

The City further contends the trial court erroneously admitted Dr. Wilson's opinions because they were based on hearsay.  But "[e]xperts may rely upon hearsay in forming an opinion and may state the basis for the opinion."  (*Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 933; *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210 [Fourth Dist., Div. Two]; Evid. Code, §§ 801, 802.)  The City has not shown the court abused its discretion in allowing Dr. Wilson to testify based on hearsay:  "[T]he court did not commit reversible error in the cited instances where the expert was permitted to testify to the matters he considered in forming his opinions."  (*Grimshaw v. Ford Motor Co* (1981) 119 Cal.App.3d 757, 789.)

Additionally, Dr. Wilson's testimony was cumulative of other trial evidence: "Evidence that is merely cumulative of evidence properly before the jury is not prejudicial."  (*Arques v. State of California* (1962) 199 Cal.App.2d 255, 258.)  Finally, the City cannot show prejudice from the admission of Dr. Wilson's testimony because the jury

17

found, based on substantial evidence that Shell did not cause harm, a finding sufficient by itself to defeat all of the City's claims.

*D. Amendment of Complaint*

We also reject the City's related argument that the City should have been permitted to amend its complaint to allege that Shell supplied TCP to Lockheed. (*Estes v. Smith* (1955) 132 Cal.App.2d 529, 535.) The trial court denied the City's motion to amend because it would involve "a new theory of liability — different facts, different circumstances, different parties would be involved, perhaps. . . . I could foresee that you would want to have much more in-depth discovery with witnesses, documents, all kinds of things . . . . [¶] . . . sometimes when folks come in and they're looking for—to amend, and they're seeking a different remedy, a cause of action, but it's based on pretty much the same things in a different remedy, that may be one way to do it. But here, we—to me, this is a completely new theory of liability . . . ."

Leave to amend is entrusted to the trial court's sound discretion and will not be disturbed on appeal absent a clear showing of abuse. (*M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1534.) If there is prejudice to the opposing party caused by delay in seeking leave to amend, the trial court may deny leave to amend. (*Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 746; *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 486-488.) Moreover, the trial court has "wide discretion" to deny leave "where the amendment raises new issues after the pleadings have been settled . . . ." (*Stockton v. Ortiz* (1975) 47 Cal.App.3d 183, 194.)

18

During trial, after resting its case in April 2010, the City proposed an amendment alleging that Shell supplied industrial TCP to Thiokol Chemical Corporation and that Thiokol then utilized this TCP to manufacture the LP-33 used at the Lockheed facility. The City's new theory of liability differed significantly from its original theory premised on TCP being present in Shell's agricultural pesticide, D-D. The new claim could involve different witnesses, documents, and other evidence. The court denied leave to amend because it would add "a completely new theory of liability" involving "different facts" and "different circumstances" and the need for additional discovery. Under these circumstances, the denial of leave to amend was not an abuse of discretion. (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; *Stockton v. Ortiz, supra*, 47 Cal.App.3d at pp. 192-194; *Yee v. Mobilehome Park Rental Review Bd.* (1998) 62 Cal.App.4th 1409, 1417, 1428-1429.)

The City contends it "could not have amended the complaint earlier because Shell did not disclose its Lockheed defense until the eve of trial." But the City had known Dr. Wilson would be a witness since May 2009. Before November 2009 and nearly three months before trial began, the City made a motion in limine to bar Shell from advancing the Lockheed defense. The City deposed Dr. Wilson a month before trial. The trial court "was in the best position to weigh the relative merits" of the City's request for leave to amend. (*M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc., supra*, 202 Cal.App.4th at p. 1536.) The City has not shown the trial court abused its discretion by denying the City leave to amend in the middle of trial.

19

*E. Shell's Notice and Knowledge*

The City's next set of arguments involves evidence about Shell's notice and knowledge about contamination from soil fumigants and related jury instructions about risk-benefit, government regulation, and punitive damages.

*1. The Deposition Testimony of Stommel and Canfield*

In January 1983, John Willet, a Shell official, prepared a memorandum for Shell in which he summarized the environmental risks associated with the soil fumigant business and discussed the reasons for Shell exiting the business or adopting alternative course of action. In the exit memorandum and in his testimony, Willet acknowledged that, before 1983, Shell did not fully understand the technical aspects of soil fumigants. He also testified that Shell could not have warned about groundwater contamination risks because the risks were unknown: during "the period of time that this product was sold, from the '40s until the '80s, it was not known that it could contaminate groundwater." Willet denied that Shell knew before 1983 about contamination resulting from field applications of Shell's products.

In order to discredit Willet's evidence, the City sought to introduce deposition testimony from two former Shell employees—Thomas Stommel and Mark Canfield—that Shell knew about TCP contamination between 1979 and 1982 but did not disclose it to regulatory authorities.

Error is not presumed; it must be shown affirmatively. (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1532.) Here the subject evidence was not actually excluded.

20

(*People v. Richardson* (2008) 43 Cal.4th 959, 1017, fn. 20.) As demonstrated in Shell's brief, most of the deposition testimony by Stommel and Canfield was played for the jury and the corresponding exhibits were admitted. The only evidence excluded were three excerpts (six pages) of Canfield's deposition in which Canfield indicated that: (1) D-D ingredients—1,2-D and TCP—were not detected in Hawaii groundwater; (2) he had no recollection of whether Shell had disclosed to regulators whether there were detections of TCP in groundwater outside California before 1982; and (3) he had no recollection of advising certain regulatory officials between 1981 and 1983 that D-D might contaminate groundwater when used according to its label.

The court excluded these excerpts because, (a) to the extent they were meant to show Shell knew that D-D posed a risk of contaminating groundwater through routine application to crops, the City had already introduced such evidence and, (b) to the extent the City meant to use these excerpts to hold Shell liable for failing to disclose information to an agency, the evidence was irrelevant. Before the City played Stommel and Canfield's depositions at trial, the City had already elicited extensive testimony concerning its theory of Shell's notice and knowledge from Shell employees and the City's own expert— including testimony about Stommel and Canfield's communications with regulators about D-D residues or ingredients found in groundwater outside California. Additionally, the City had introduced extensive documentary evidence concerning the City's theory of Shell's notice and knowledge, including Stommel and Canfield's communications with regulators and other internal Shell documents. After the depositions were played, the City

21

presented further testimony and documentary evidence concerning Shell's notice and knowledge.

Thus, the court did not abuse its discretion when it excluded this cumulative evidence. (See *Weller v. Chavarria* (1965) 233 Cal.App.2d 234, 247.) The exclusion of cumulative evidence is not prejudicial. (*Zellers v. State of California* (1955) 134 Cal.App.2d 270, 277.) Furthermore, there was no prejudice because the excluded evidence had no bearing on the jury's finding, based on substantial evidence, that Shell did not cause harm, a finding sufficient by itself to defeat all of the City's claims.

*2. Trial Exhibits 188 through 191*

The City contends the trial court also erred by excluding trial exhibits 188, 189, 190, and 191 as evidence of Shell's notice and knowledge that D-D was defective. The City first offered these four exhibits at the end of trial, after both parties had rested and just before the jury began to deliberate. No witness had ever discussed these exhibits and the trial court excluded them for that reason.

Where no witnesses explained how the contents of specific exhibits were relevant, the trial court does not abuse its discretion by declining to admit the exhibits. (*People v. Monterroso* (2004) 34 Cal.4th 743, 779; *People v. McNeal* (2009) 46 Cal.4th 1183, 1202.) Our review of the four exhibits shows them to be a diverse collection of miscellaneous materials, unlikely to have been useful to the jury without a witness's testimony to give them context. Moreover, these exhibits were cumulative of other evidence regarding

22

Shell's purported notice and knowledge. A court does not abuse its discretion by excluding cumulative evidence.

In any event, the City was not prejudiced by the exclusion of exhibit Nos. 188 through 191. The City contends these four exhibits were relevant to show Shell's supposed notice and knowledge and thus demonstrated Shell's products were defective. But the excluded evidence had no bearing on the jury's finding, based on substantial evidence, that Shell did not cause harm, a finding sufficient by itself to defeat all of the City's claims.

*3. Jury Instructions*

CACI No. 1204 instructs the jury on the standard for strict liability and allows the parties and the court to add relevant factors the jury may consider in deciding a risk-benefit affirmative defense. The City argues that the trial court erred by instructing the jury to consider as one of those factors "the risks that were known or scientifically knowable at the time the product was manufactured and distributed." According to the City, "this additional element improperly injected negligence and failure to warn concepts into the risk-benefit test."

The instruction was relevant and appropriate. "[O]nce the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden should appropriately shift to the defendant to prove, in light of the relevant factors, that the product is not defective." (*Barker v. Lull Engineering Co, supra,* 20 Cal.3d at p. 431.) "[E]vidence that a product is designed in accordance with the existing state of the art is

23

relevant in a risk-benefit analysis." (*Rosburg v. Minnesota Mining & Mfg. Co.* (1986) 181 Cal.App.3d 726, 735; *McLaughlin v. Sikorsky Aircraft* (1983) 148 Cal.App.3d 203, 209-210.) It would have been error if the jury was not permitted to consider scientifically available facts when deciding the risk-benefit defense.

The City also argues that the court should not have instructed the jury that "[i]n determining whether to impose punitive damages and the amount of such damages, you may consider whether the defendant complied with state or federal regulations." The City claims this instruction improperly "directed the jury to consider compliance with regulations and registration in evaluating whether Shell's [products] were defective." That instruction, however, was directed at the jury's determination of punitive damages.

The City concedes that "the jury did not reach the risk benefit section of CACI 1204." Nevertheless, the City argues that the risk-benefit and punitive damages instructions encouraged the jury to find Shell's products were not defective. However, the court instructed the jury to consider the risk-benefit affirmative defense *only* if it found the City had proved the three elements of its strict liability claims and permitted it to consider compliance with regulations only in deciding punitive damages. The jury had already found the City failed to make out a prima facie case by failing to prove any injury was caused by the product design and the jury never reached the question of whether to impose punitive damages. As a result, there was no possible prejudice from either of these

24

instructions.  (*Thompson v. Keckler* (1964) 228 Cal.App.2d 199, 214; *Baxter v. Rogers* (1961) 191 Cal.App.2d 358, 365-366.)[9]

*F.  Cumulative Error and the New Trial Motion*

The trial court was "not required to specify any reasons for denying" a new trial motion.  (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1272, fn. 17 [Fourth Dist., Div. Two].)  For the reasons we have expressed above, we conclude there was no prejudicial error.  In the absence of prejudicial error, there was no cumulative error and the trial court did not err in denying the City's new trial motion.  (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872.)

V

THE CITY'S APPEAL CONCERNING WILBUR-ELLIS

Because we affirm the judgment in favor of Shell, there is no basis for liability against Wilbur-Ellis.  Even if the City had defeated Wilbur-Ellis's motion for summary judgment, the City could not establish that Shell caused harm and that Wilbur-Ellis was liable.  Similarly, any error in denying the motion for new trial was not prejudicial.  Nevertheless, we offer a brief analysis of the City's appeal of the judgment in favor of Wilbur-Ellis.

---

[9] Our resolution of these issues means we do not need to discuss the admission of the expert testimony of Edward Tinsworth.

Wilbur-Ellis moved for summary judgment on the grounds that the City could not offer evidence that Wilbur-Ellis supplied any of the products containing TCP or DBCP and used by Redlands farmers. The motion was granted on the grounds that (1) the City did not have direct evidence linking Wilbur-Ellis to Grigsby Brothers (Grigsby), a Redlands-based retailer of soil fumigants and 2) none of Wilbur-Ellis's employees remembered selling soil fumigants in the Redlands area. Later, in its motion for new trial the City identified two former Grigsby employees who stated Wilbur-Ellis had supplied soil fumigant to Grigsby. The trial court ruled the City did not exercise reasonable diligence in locating the former Grigsby employees. On appeal, the City asserts that substantial circumstantial evidence presented by the City reasonably established an inference that Wilbur-Ellis was a supplier of Shell soil fumigants to Grigsby and thus to Redlands farmers.

*A. Standards of Review*

We independently review the order granting Wilbur-Ellis's summary judgment motion. Its moving papers are strictly construed and the City's opposing papers are liberally construed. (*Wilson v. 21st Century Ins.Co.* (2007) 42 Cal.4th 713, 717; *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.) Appellate review is limited, however, to those facts which were properly submitted in declarations to the trial court or conceded in the briefs on the motion. (*Havstad v. Fidelity National Title Ins. Co.* (1997) 58 Cal.App.4th 654, 661.)

26

A Court of Appeal applies the same three-step analysis required of the trial court. We identify the issues framed by the pleadings to determine whether the moving party has established facts which negate the opponent's claim and justify a judgment in movant's favor. When a prima facie showing has been made, the final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. (*Hamburg v. Wal-Mart Stores, Inc.* (2004) 116 Cal.App.4th 497, 503.) A defendant is entitled to summary judgment upon a showing that there is a complete defense to the plaintiff's causes of action or that one or more elements of the plaintiff's cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (*o*); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853-854.) A motion for summary judgment is properly granted when all of the submitted papers show that "there is no triable issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 101.) Once the court finds that the moving party made its prima facie showing, the court must determine if the opposing party met its burden of producing sufficient evidence to create triable issue of fact. If the opposing party failed to meet that burden, the grant of summary judgment should be affirmed. (Code Civ. Proc., § 437c, subd. (p)(2); *Saelzer v. Advanced Group 400, supra,* 25 Cal.4th at pp. 780-781.)

B. *The Separate Statement*

In support of its motion for summary judgment, Wilbur-Ellis submitted one undisputed material fact: "No admissible evidence has been revealed, nor can it be

27

obtained, which proves that any product containing TCP or DBCP distributed by Wilbur-Ellis was ever applied in or around the City of Redlands (the 'City'), which contaminated the City's water supply." Of course, the jury found Shell had not contaminated the City's water supply. In any event, there was no triable issue of material fact concerning the liability of Wilbur-Ellis.

Most of the evidence submitted by the parties consisted of the same declarations and deposition testimony from Wilbur-Ellis employees, Redlands farmers, and state and city officials. As supporting evidence, Wilbur-Ellis relied on Jack Ferri, the designated representative for Wilbur-Ellis, who testified that, although Wilbur-Ellis did not have complete records before the 1990's, he conducted an extensive investigation, including interviews with former employees, but testified that he could not find any evidence that Wilbur-Ellis ever sold any soil fumigant in Redlands. Other employees could not recall anything about Wilbur-Ellis selling soil fumigants in Redlands.

Thomas and George Archibald, a Redlands farmer and his son, testified they did not use Wilbur-Ellis soil fumigants or recall anyone who did. Bert "Pete" Marcum, a Redlands citrus grove owner, submitted a declaration stating he was unaware of any sales or applications of any Wilbur-Ellis soil fumigants at any time between 1963 and 2009 in the Redlands area. Marcum knew that other growers used Shell's Nemagon but the only local Redlands supplier that Marcum did business with was Grigsby Brothers. Marcum had occasionally had DBCP applied to several Redlands properties. Other witnesses could not testify to a connection with Wilbur-Ellis.

George C. Diggs, who was deposed as the person most qualified for the City, had no information about Wilbur-Ellis being the source of TCP or DPCP contamination for Redlands water. Larry Wilhoit, a state environmental scientist with the Department of Pesticide Regulation, in charge of the pesticide use database, testified in a deposition there was no evidence in the state database of any applications of Wilbur-Ellis's products in Redlands at any time.

In opposition to Wilbur-Ellis's separate statement, the City contended there was substantial circumstantial evidence that Shell sold soil fumigants to Wilbur-Ellis for distribution in Redlands by the Grigsby Brothers. The evidence, however, was extremely slight, consisting only of evidence that Shell sold products to Wilbur-Ellis on two or three occasions without demonstrating any connection to the Grigsby Brothers. In interrogatory responses, Wilbur-Ellis acknowledged documents produced by Shell "appear to show" sales to Wilbur-Ellis in Redlands and Yucaipa in 1968, 1969 and 1970.[10] However, Shell's sales records for D-D only showed two or three deliveries to Wilbur-Ellis in Redlands and Yucaipa in 1968 and 1969. Nevertheless, the City contends the admission, coupled with Shell's sales records, was sufficient to demonstrate a triable issue about whether Wilbur-Ellis supplied Nemagon (DBCP) and D-D (TCP) in Redlands.

---

[10] The trial court ruled that the Shell DBCP sales records for 1972, 1973, 1974, 1975, and 1976 were inadmissible hearsay lacking foundation.

29

The City further contends the evidence showed Redlands farmers purchased Shell soil fumigants. However, the City's evidence in this respect is equivocal. Although Marcum testified that in Redlands "the only supplier headquartered in that area is Grigsby Brothers," he also testified that other suppliers made sales in the area. Allen Dangermond, another long-time Redlands farmer, testified that he and other Redlands citrus farmers used Dow Fumazone, not Shell's Nemagon, in the 1960's and 1970's—and that primarily Grigsby Brothers sold Fumazone and Nemagon—but Dangermond did not state that Grigsby Brothers was the exclusive seller.[11]

The City claims this inconclusive evidence established that Grigsby Brothers was the sole source of Shell soil fumigants applied by farmers in Redlands. But, even if Grigsby Brothers was the sole supplier of Shell's soil fumigants to Redlands farmers, it is not a reasonable inference that the Shell soil fumigants were sold to Grigsby Brothers by Wilbur-Ellis. Even assuming that the Shell documents from 1968 and 1969 showed deliveries of Shell D-D to Wilbur-Ellis in Redlands, the City did not link these deliveries to any actual application of the product by Redlands farmers. Significantly, the only Shell D-D soil fumigant applications in the 1968 to 1970 time frame were by Thomas Archibald. But Archibald does not remember ever using any Wilbur-Ellis soil fumigants and he purchased D-D from one of three different suppliers.

---

[11] Robert Knight, another farmer, submitted a declaration that he bought Shell D-D from Grigsby Brothers in 1953 and 1955 but he did not mention Wilbur-Ellis.

*C. Analysis*

Based on our independent review, we decide the trial court did not err in granting Wilbur-Ellis's motion for summary judgment. As already discussed, causation is an essential element of the City's claims based on strict liability, negligence, nuisance, and trespass. Here the City could not show it was more likely than not that Wilbur-Ellis supplied any of the products containing DBCP or TCP that purportedly contaminated the City's water.

Wilbur-Ellis met its prima facie burden by showing that the City did not possess evidence that Wilbur-Ellis supplied any products containing DBCP or TCP actually used in the Redlands area. A defendant can use plaintiff's discovery responses to establish that plaintiff cannot prove its case. (*Casey v. Perini Corp.* (2012) 206 Cal.App.4th 1222, 1231; *Andrews v. Foster Wheeler, LLC, supra,* 138 Cal.App.4th at p. 107; *Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64, 76, 83.)

Taking all of the evidence submitted in support of and in opposition to Wilbur-Ellis's motion, none of the evidence established that Wilbur-Ellis provided the soil fumigants used on Redlands crops. The City's own witness, George Diggs, candidly testified that he had no information showing that Wilbur-Ellis was the source of the contamination in the City's water system. As discussed above, state records maintained by the Department of Pesticide Regulation disclosed that none of the applications of DBCP- or TCP-containing products in the Redlands area were registered to Wilbur-Ellis. DPR

31

had no record of the application of any TCP or DBCP products supplied by Wilbur-Ellis in the Redlands area.

Wilbur-Ellis's employees offered no evidence that Wilbur-Ellis had sold products in Redlands. Other witnesses could not offer evidence of a connection with Wilbur Ellis. The Redlands farmers—Marcum and the Archibalds—could not remember the brand names of any soil fumigants, did not recognize Wilbur-Ellis's Red Top brand, and did not recall the purchase or application of any Wilbur-Ellis soil fumigant products. Dangermond testified about Dow Fumazone and did not implicate Wilbur-Ellis.

The only proven applications of D-D in Redlands in 1968, 1969 and 1970 were by Archibald who does not recall ever using Wilbur-Ellis soil fumigants. Although Shell purportedly delivered a product to Wilbur-Ellis in Redlands in 1968, 1969, and 1970, suppliers other than the Grigsby Brothers also supplied soil fumigants to Redlands farmers. Archibald purchased the soil fumigants from three possible suppliers. There is no evidence that Wilbur-Ellis sold D-D to any of these suppliers, including Grigsby Brothers.

Given this evidence from diverse sources—the state regulatory agency, the local farmers, the local suppliers, Wilbur-Ellis and the City itself—Wilbur-Ellis met its prima facie burden of establishing that the City cannot show causation. With this evidence, Wilbur-Ellis established that the City did not possess any evidence—direct or circumstantial—to prove that Wilbur-Ellis supplied any of the DBCP or TCP products applied in Redlands. Therefore, it cannot reasonably be inferred that Wilbur-Ellis "more

32

likely than not" supplied DBCP or TCP containing soil fumigants to Redlands farmers. (*Smith v. Wells Fargo, N.A.* (2005) 135 Cal.App.4th 1463, 1473.)

Because Wilbur-Ellis met its initial burden of production and made a prima facie showing of the nonexistence of any triable issue of material fact, the burden shifted to the City to produce admissible evidence to make a prima facie showing of the existence of a triable issue of material fact. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850.) The City did not raise a reasonable inference that Wilbur-Ellis supplied soil fumigant to Grigsby Brothers which was subsequently used in Redlands. Instead of direct evidence, City relies on a "speculative chain of possibilities" (*Clapper v. Amnesty Intern. USA* (2013) 133 S.Ct. 1138, 1141) to cobble together circumstantial proof against Wilbur-Ellis. The bulk of the exhibits submitted by the City in opposition to the motion did not tend to prove that Wilbur-Ellis supplied the DBCP or TCP soil fumigants applied in Redlands. Because of the absence of evidence, the City mostly argues why it is plausible such evidence does not exist. All the City proved is that Shell soil fumigants used by Redlands farmers may have been sold by Grigsby Brothers. But, the City could not prove any of those soil fumigants were sold by Wilbur-Ellis.

Instead, the City argues that, because Shell allegedly shipped soil fumigants to Wilbur-Ellis and because Grigsby Brothers was the only place in Redlands that sold soil fumigants, it can be inferred that Wilbur-Ellis must have supplied the soil fumigants that were applied by Redlands farmers. Evidence submitted in support of and in opposition to summary judgment must be admissible. (Code Civ. Proc., § 437c, subd. (d); *Hayman v.*

*Block* (1986) 176 Cal.App.3d 629, 638-639.) The City relies in part on the inadmissible evidence about shipments between 1972 and 1976. In deciding this appeal, this Court must disregard any evidence to which an objection was made and sustained by the trial court. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) Thus, any arguments based on the 1972 to 1976 Shell documents must be rejected as a matter of law.

When the rest of the evidence is examined, it becomes clear that the inference the City urges is not a reasonable one. Speculation, conjecture, and multiple inferences cannot be substituted for evidence of causation. (*Saelzer v. Advanced Group 400, supra,* 25 Cal.4th at p. 775.) As explained in *Leslie G. v. Perry & Associates*: "We will not, however, draw inferences from thin air. Where, as here, the plaintiff seeks to prove an essential element of her case by circumstantial evidence, she cannot recover merely by showing that the inferences she draws from those circumstances are *consistent* with her theory. Instead, she must show that the inferences favorable to her are *more reasonable or probable* than those against her." (*Leslie G. v Perry & Associates* (1996) 43 Cal.App.4th 472, 483.) Mere possibilities are not enough to create a triable fact on the issue of causation. (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1105.)

Circumstantial evidence that the defendant supplied the product to which the plaintiff was exposed must rise to the level of a reasonable inference. (*Lineaweaver v. Plant Insulation Co., supra,* 31 Cal.App.4th at p. 1420; *Smith v. ACandS, Inc.* (1994) 31 Cal.App.4th 77, 89 (disapproved on other grounds in *Camargo v. Tjaarda Dairy* (2001) 25

34

Cal.4th 1235, 1245; *Casey v. Perini Corp., supra,* 206 Cal.App.4th 1222.) Full consideration of all of the evidence here shows that the City's proffered inferences are not reasonable. The only evidence of shipments to Wilbur-Ellis in Redlands that can be considered were small shipments of D-D in 1968, 1969, and 1970. Second, the only applications of Shell D-D in Redlands during that period were the three applications by Archibald who does not recall using Wilbur-Ellis products and who testified that he bought the D-D from Grigsby Brothers, Merit Oil Company in Bloomington, or Riverside Fertilizer Company.

It is not a reasonable assumption that Wilbur-Ellis must have sold Shell's soil fumigants to Grigsby Brothers and not customers outside of Redlands or some other location, especially when there are no state records of any soil fumigant applications in Redlands of Wilbur-Ellis products, the farmers do not remember buying a Wilbur-Ellis or Red Top label soil fumigant from Grigsby Brothers, and Arnold remembered using three different suppliers. The City's insistence that Wilbur-Ellis must have sold Shell D-D to Grigsby Brothers is not reasonable in view of the many variables and unknowns and evidence tending to prove otherwise. The City has failed to produce sufficient circumstantial evidence allowing reasonable inferences. Therefore, we affirm the trial court's grant of summary judgment in favor of Wilbur-Ellis.

D. *Denial of the City's Motion for New Trial*

We also affirm the trial court's denial of the City's motion for new trial. In September 2010, almost a year after Wilbur-Ellis's motion for summary judgment was

granted, the City served notice of its motion for new trial based on the City's purported discovery of two "new" witnesses, Robert Brundage and Carl Anderson.

The City had first learned of Brundage's identity in a February 2009 deposition. But the City did not submit its new trial motion identifying Brundage and Anderson until September 2010, after the trial against Shell had concluded. Brundage's (unsigned and therefore inadmissible) declaration simply stated that Grigsby Brothers bought products from Wilbur-Ellis and sold soil fumigants in Redlands. The declaration does not specifically state that Grigsby Brothers bought TCP or DBCP containing products from Wilbur-Ellis or that, if it did, those were the products that were sold to farmers in Redlands. At trial, Brundage testified that he did not know from which company Grigsby Brothers purchased Shell's products but that Grigsby Brothers purchased from several sources—Chevron, Pure Gro, Riverside Fertilizer Works, and a number of others. Brundage testified that Wilbur-Ellis was a wholesaler from whom Grigsby Brothers purchased fertilizers.

Anderson's declaration showed that he worked at Grigsby Brothers for just two years—1960-1962. Anderson stated he recalled seeing products with the Red Top label but does not state that these were TCP or DBCP-containing products. He could not say that Wilbur-Ellis sold products to Grigsby Brothers: "I recall that Grigsby sold quite a few products supplied by Wilbur-Ellis, but I do not recall any particular products, sales or customers of such products in this time period almost 50 years ago" and "I am not aware

36

of applications of any soil fumigants sold or distributed by Wilbur-Ellis, or with the Red Top label on them, in Redlands or its vicinity at any time."

In denying the motion for new trial, the trial court did not abuse its discretion in finding that the City did not demonstrate that it exercised reasonable diligence in obtaining the two "new" witnesses or that the subject evidence would change the outcome. (*Schultz v. Mathias* (1970) 3 Cal.App.3d 904, 910; *De Felice v. Tabor* (1957) 149 Cal.App.2d 273, 275.) Bare allegations of diligence are not enough, especially where it was clear that the moving party was on notice of the existence of the new evidence months before trial. (*Bostard v. Bostard* (1968) 258 Cal.App.2d 793, 797; *Schultz*, at p. 910.)

The City identified Brundage in February 2009. Wilbur-Ellis's motion for summary judgment was heard in August 2009. In September 2009, Brundage and Anderson's declaration were prepared. Wilbur-Ellis's motion for summary judgment was granted in October 2009. Brundage testified at trial in March 2010. In May 2010, the jury issued a verdict in Shell's favor. Not until September 2010 did the City makes it motion for new trial. Under these facts, the City did not demonstrate diligence. The court did not abuse its discretion denying the motion for new trial.

## VI

## MOTION TO TAX COSTS

Before trial, Shell offered to compromise pursuant to Code of Civil Procedure section 998 (998 offer), offering the City $200,000 and a waiver of fees and costs. "A prevailing party who has made a reasonable and good faith pretrial offer pursuant to

section 998 is entitled to specified costs, . . ." (*Adams v. Ford Motor Co.* (2011) 199 Cal.App.4th 1475, 1483.)  The trial court found the offer here was "reasonable and in good faith."  The City has the burden of showing this decision was an abuse of discretion. (*Essex Ins. Co. v. Heck* (2010) 186 Cal.App.4th 1513, 1529; *Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 117.)

Reasonableness is determined by the circumstances when the offer was made. (*Elrod v. Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692, 699.)  As a general rule, reasonableness is based on potential exposure.  (*Adams Ford Motor Co., supra*, 199 Cal.App.4th at p. 1483.)  A defense verdict constitutes a prima facie showing that an offer was reasonable and must be rebutted by the losing party.  (*Bates v. Presbyterian Intercommunity Hospital, Inc.* (2012) 204 Cal.App.4th 210, 221.)

In this case, Shell submitted evidence it did not cause harm to the City's wells. Indeed, key evidence negating the City's allegations of harm came from the City itself, including the reports in which the City assured the public its drinking water supply was safe and reliable from 1999 until 2030.  Therefore, Shell could not be liable for remediation costs.  In the absence of evidence of causation or harm, Shell's $200,000 offer was actually consistent with the pretrial settlements of $200,000 or $300,000 by defendants Occidental Petroleum and Dow.  (*Adams Ford Motor Co., supra*, 199 Cal.App.4th at p. 1486.)

Additionally, the City cannot show an abuse of discretion under Code of Civil Procedure section 998 because two of its original four claims proceeded to trial.  (See, e.g.,

38

*People ex rel. Lockyer v. Fremont General Corp.* (2001) 89 Cal.App.4th 1260, 1271.)  A

defendant's 998 offer is not "evaluated simply in comparison to the judgment [plaintiff]

sought," and must instead be measured by what the defendant knows about the plaintiff's

prospects for prevailing at trial.  (*Adams Ford Motor Co., supra*, 199 Cal.App.4th at pp.

1485-1486; accord, *Elrod v. Oregon Cummins Diesel, Inc., supra*, 195 Cal.App.3d at p.

699.)  When a defendant is confident of prevailing, "it is consistent with the legislative

purpose of section 998 for the defendant to make a modest settlement offer.'"  (*Bates v.

Presbyterian Intercommunity Hospital, Inc., supra*, 204 Cal.App.4th at p. 220.)  Shell

reasonably concluded it had a strong likelihood of prevailing at trial based on the evidence

it did not cause harm to the City.  The City reasonably should have known that its chances

of prevailing were slight, further confirming the 998 offer was reasonable.  (See *Elrod,* at

pp. 699-700.)

Finally, Shell's 998 offer included a waiver of costs, a significant monetary value.

(*Adams v. Ford Motor Co., supra*, 199 Cal.App.4th at p. 1485.)  Had the City accepted

Shell's 998 offer, the City would have avoided paying any of the $683,393.20 costs award.

Accordingly, the waiver of costs "substantially increased the settlement's potential value in

the event [the City] failed to secure a more favorable judgment against [Shell]" and

underscored the reasonableness of Shell's offer.  (*Id.* at p. 1486; accord, *Bates v.

Presbyterian Intercommunity Hospital, Inc., supra*, 204 Cal.App.4th at p. 222; *Jones v.

Dumrichob* (1998) 63 Cal.App.4th 1258, 1264.)

As to the City's challenge to the reasonableness of the costs, substantial evidence showed the costs were proper and recoverable. The amount of costs awarded is a discretionary decision for the trial court. (See *Chaaban v. Wet Seal, Inc.* (2012) 203 Cal.App.4th 49, 54; *Adams v. Ford Motor Co., supra*, 199 Cal.App.4th at p. 1487.) The trial court issued a detailed 27-page order, partially granting and partially denying the City's motion to tax costs, and giving due consideration to the application of Government Code section 68092.5. The City has not demonstrated that the court abused its discretion or legally erred in awarding costs. (*Adams,* at p. 1488; *Skistimas v. Old World Owners Assn.* (2005) 127 Cal.App.4th 948, 953.)

## VII

## CONCLUSION

As we said at the outset, substantial evidence supports the jury's finding that Shell did not cause harm to the City based on strict liability or negligence. There is no basis for liability by Shell or Wilbur-Ellis to the City.

We affirm the judgment. In the interests of justice, we order the parties to bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.